[No. A026020. First Dist., Div. One. June 18, 1986.]

UNITED STATES LINES, INC., Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

530

COUNSEL

John B. Lowry, John R. Reese, Kenta K. Duffey and McCutchen, Doyle, Brown & Enersen for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and Timothy G. Laddish, Deputy Attorney General, for Defendant and Respondent.

OPINION

**RACANELLI, P. J.**—United States Lines, Inc. (U.S. Lines) brought suit against respondent State Board of Equalization (Board) for refund of sales taxes paid pursuant to a deficiency determination following denial of its administrative refund claim. The parties stipulated to the material facts in conjunction with the filing of cross-motions for summary judgment. The trial court denied U.S. Lines's motion and granted the Board's motion for summary judgment. This appeal ensued.

FACTS

The stipulated facts follow:

U.S. Lines was the owner of two massive container cranes scheduled to be erected at its facility at the Port of New York Authority Terminal in New Jersey. Before the cranes were erected, however, U.S. Lines began negotiations for the lease of space at the Port of Oakland. In anticipation of an agreement, U.S. Lines shipped the equipment components to California.

On March 7, 1973, U.S. Lines and the Port of Oakland entered into four interdependent, contemporaneously effective agreements: a lease of an office and terminal building; a preferential assignment agreement providing access to wharf and berth areas; a crane purchase agreement whereby U.S. Lines *sold* the two cargo cranes to the port; and a crane lease agreement whereby the port leased the cranes back to U.S. Lines.

For the lease of the office and terminal building, U.S. Lines agreed to pay the prevailing rate for rental of the land and to reimburse the port for construction costs amortized over eight years.

Under the terms of the preferential assignment agreement, U.S. Lines received the primary right to use 20 acres of port land, including the wharf area and berth area. (Other shippers possessed secondary rights to use the areas.) U.S. Lines agreed to pay the port's usual tariffs, at a minimum of $500,000 to a maximum of $692,000, depending on the extent of use.

The crane purchase agreement provided that U.S. Lines *sold* the cranes to the port, ownership to be effective upon the safe erection of the cranes. The "actual purchase price" was ultimately fixed at $3.68 million.[1] However, the port had no obligation to pay the purchase price in cash; instead, U.S. Lines acknowledged that the port's execution of the 25-year crane lease (at a dollar-a-year rental) was valuable consideration for the cranes.[2] U.S. Lines retained the option of earlier termination and substituted user which would entitle it to reimbursement for its "incompleted leasehold interest" calculated on the basis of the actual purchase price. The effective date of the crane lease (and related agreements) is the date the cranes became certified for safe operation and use: January 13, 1975. Upon passage of title, the cranes became real property fixtures in which U.S. Lines possesses a taxable possessory interest.[3]

### Issues Presented

The larger question on appeal is whether the sale of two 750-ton container cranes by U.S. Lines to the Port of Oakland in connection with a leaseback agreement constituted a taxable sale of tangible personal property. A related issue is whether use of the stated purchase price of $3.68 million—as the basis for the disputed tax assessment ($239,200)—was proper.

---

[1]The agreement states an original purchase price of $3.2 million subject to adjustment for U.S. Lines's assembly and installation costs with a ceiling price of $3.68 million. Since the total costs exceeded that amount, the actual purchase price was fixed at $3.68 million.

[2]The cranes involved are designated low profile, sliding boom, diesel electric cranes, 104 feet in height and 92 feet in width, with a legs clearance of 48 feet. Each crane, which travels on 100-foot gauge rails, can lift 51 tons and extend the payload 113 feet over the docking berths and 110 feet behind the cranes over the land facilities. In the 1981 Port of Oakland Handbook, the cranes were listed with estimated replacement costs of $3.35 million and $3.40 million each.

[3]U.S. Lines's total possessory interest in both cranes under the crane lease is currently assessed by Alameda County for 1983-1984 property tax purposes (with the limitations of art. XIII A of the Cal. Const.) at $3.52 million.

*Standard of Review*

■ Since the underlying action was submitted and decided on stipulated facts, we are confronted solely with questions of law and make our own judgment independent of the trial court's determination. (*Cedars-Sinai Medical Center* v. *State Bd. of Equalization* (1984) 162 Cal.App.3d 1182, 1186-1187 [208 Cal.Rptr. 837]; *Far West Services, Inc.* v. *Livingston* (1984) 156 Cal.App.3d 931, 936, fn. 3 [203 Cal.Rptr. 486]; *Container Corp. of America* v. *Franchise Tax Bd.* (1981) 117 Cal.App.3d 988, 993 [173 Cal.Rptr. 121], affd. (1983) 463 U.S. 159 [77 L.Ed.2d 545, 103 S.Ct. 2933]; *Dealers Installation Service, Inc.* v. *State Bd. of Equal.* (1970) 13 Cal.App.3d 395, 399 [90 Cal.Rptr. 888].)

## DISCUSSION

## I.

*Transfer of Tangible Personal Property*

U.S. Lines argues, in essence, that the provisions authorizing imposition of a retail sales tax on tangible personal property (§§ 6006, subd. (a) and 6051 of the Rev. & Tax. Code[4]) do not apply to the sale of the cranes which became affixed to real property at the time of sale. Relying on this court's decision in *Seatrain Terminals of California, Inc.* v. *County of Alameda* (1978) 83 Cal.App.3d 69 [147 Cal.Rptr. 578], U.S. Lines contends that since the cranes were "in place" on the rails at the operative time of sale, they became—by definition—real property fixtures not subject to the sales tax provisions. The argument misses the mark.

Under the Sales and Use Tax Law, a sale is defined, inter alia, as "[a]ny transfer of title or possession, . . . conditional or otherwise, . . . of *tangible* personal property for a consideration." (§ 6006, subd. (a), italics added; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) ■ "The sales tax is not a tax on sales but is an excise tax on the privilege of conducting a retail business which is measured by gross receipts from sales. [Citations.] . . . ■ The tax is levied on the seller, not on the buyer and it is levied on the seller regardless of whether or not he obtains reimbursement from the buyer. [Citations.] The retailer's right of reimbursement from the buyer is optional with the retailer and may be waived. [Citation.] The tax is not imposed on individual sales [citation],

---

[4]Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

but on gross receipts [citation]. The sales price includes services that are part of the sale (Rev. & Tax. Code, § 6012). (*Select Base Materials* v. *Board of Equal.*, 51 Cal.2d 640 [355 P.2d 672].) It is presumed that all gross receipts are subject to the tax until the contrary is established (Rev. & Tax. Code, § 6091)." (*Coast Elevator Co.* v. *State Bd. of Equalization* (1975) 44 Cal.App.3d 576, 587-588 [118 Cal.Rptr. 818], disapproved on another point in *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 93, fn. 4 [130 Cal.Rptr. 321, 550 P.2d 593].)

As a general proposition, an item which was originally movable personal property (Civ. Code, §§ 657, 663) may become real property if it is permanently affixed to or resting upon land (Civ. Code, §§ 658-660).

 Items annexed to real property are classified as real property improvements and fixtures for purposes of ad valorem real property taxes. (§§ 104-105; see, e.g., *Trabue Pittman Corp.* v. *County of L. A.* (1946) 29 Cal.2d 385 [175 P.2d 512] [bank's counters and tellers cages regarded as real property "fixtures" for property tax purposes]; *Seatrain Terminals of California, Inc.* v. *County of Alameda, supra,* 83 Cal.App.3d 69 [two (identical) cargo cranes positioned on rails as integral part of wharf structure constituted real property subject to ad valorem taxes].)

 U.S. Lines's myopic focus on the stipulated real property character of the cranes for purposes of local tax assessment and property tax payment on its possessory interest overlooks the fact that classification of affixed equipment as real property "fixtures" for property taxation purposes does not preclude classification of the same equipment as tangible personal property for sales tax purposes. (*Standard Oil Co.* v. *State Bd. of Equal.* (1965) 232 Cal.App.2d 91, 100 [42 Cal.Rptr. 543]; *Gen. Elec. Co.* v. *State Bd. of Equalization* (1952) 111 Cal.App.2d 180 [244 P.2d 427].) As Justice Friedman cogently explained: "Like many tax statutes, the sales tax law employs relatively artificial, relatively self-contained, concepts. If it utilizes popular meaning or concepts from other fields of law, it does so only by force of its own objectives and definitions. It does not define real property or 'improvements' to real property, if only because it makes little use of these terms. Its definition of tangible personal property deals with tangibility, not with distinctions between personalty and realty. To pursue the will-o'-the-wisp of definitions, concepts and distinctions from other areas of law—where they are shaped by purposes and by social and economic factors unrelated to sales taxation—leads to false goals. The coverage of the sales tax law is shaped by its own provisions and definitions and, where these are unclear, by applying its own perceived policies and concepts. (See Davis. *The Purposive Approach to the Interpretation of Sales Tax Statutes* (1966)

27 Ohio St.L.J. 429.) [¶] . . . We pointed out in *Standard Oil Co.* v. *State Bd. of Equal, supra,* 232 Cal.App.2d at pages 99-100, that the Legislature has not directed application of the ad valorem tax definitions to the field of sales taxation. The courts have often declared that definitions evolved for property tax purposes have no necessary conformity with definitions for other purposes. (*Trabue Pittman Corp.* v. *County of Los Angeles* (1946) 29 Cal.2d 385, 393 [175 P.2d 512], and cases cited.)" (*King* v. *State Bd. of Equalization* (1972) 22 Cal.App.3d 1006, 1010-1011, fns. omitted [99 Cal.Rptr. 802].)

 In the context of sales tax, two discrete situations are presented in which the sale of personal property is cloaked with the indicia of real property. First, when the object is installed by the seller on the buyer's land and becomes affixed thereto, the courts generally have held the object is personal property in the hands of the seller even though it is real property to the owner of the land. (*Coast Elevator Co.* v. *State Bd. of Equalization, supra,* 44 Cal.App.3d 576; *Gen. Elec. Co.* v. *State Bd. of Equalization, supra,* 111 Cal.App.2d 180.) Second, when the object is transferred by the seller together with the real property, the test is whether removal of the object is contemplated: if so, it is personalty; if not, the object remains part of the realty. (Cal. Admin. Code, tit. 18, § 1596, subd. (c); *Standard Oil Co.* v. *State Bd. of Equal., supra,* 232 Cal.App.2d 91.)

 As we further explain, the court below correctly determined that the sale of the cranes was a sale of personal property. U.S. Lines did *not* transfer the cranes along with the land; rather, it installed the cranes on land already owned by the port. Although the cranes became an integral part of the port's real property, the cranes were personal property in the hands of U.S. Lines at the time of sale.

Ordinarily, when personal property is affixed to the land of another, it belongs to the owner of the land (Civ. Code, § 1013) and cannot be removed.[5] For purposes of *sales* tax, the sale and installation of personal objects are nonetheless subject to sales tax even though affixed to the buyer's land. (Cal. Admin. Code, tit. 18, § 1521, subd. (b)(2)(B).)

In *Gen. Elec. Co.* v. *State Bd. of Equalization, supra,* 111 Cal.App.2d 180, involving an analogous factual setting, we considered and rejected an argument substantially similar to U.S. Lines's argument here. In that case

---

[5]Exceptions exist where removal is permitted by agreement (Civ. Code, § 1013), for good faith mistake (Civ. Code, § 1013.5) and for trade fixtures belonging to a tenant (Civ. Code, § 1019).

GE manufactured and sold a turbine generator to PG&E. Upon installation of the generator by GE, it became an integral part of PG&E's electricity steam plant—an "improvement" to PG&E's real property. The question on appeal was whether GE was a consumer of materials subject to a use tax on the cost of materials or a retail seller subject to sales tax on the contract price of the generator. In determining that GE was a seller of tangible personal property subject to sales tax, we reasoned as follows: "It is pointed out that title did not pass to Pacific until the generator was affixed in place, at which moment it became real property and taxable as such. It is undoubtedly true that upon annexation the generator became an improvement to real property, a fixture, and taxable as such. (Rev. & Tax. Code, §§ 104, 105; Civ. Code, § 660; *San Diego T. & S. Bank* v. *San Diego County,* 16 Cal.2d 142 [105 P.2d 94, 133 A.L.R. 416]; *Trabue Pittman Corp.* v. *County of Los Angeles,* 29 Cal.2d 385 [175 P.2d 512].)

"However, the argument that, because the generator became taxable as real property in the hands of Pacific, the transaction by which title was transferred to Pacific by General is conclusively determined to be not a sale, is unsound. The generator in place was clearly real property and taxable as such. But we are not interested in the nature of the property in the hands of the buyer, but in its nature in the hands of the seller—General. The sales tax is imposed on the seller, not upon the buyer. Section 6006 of the Revenue and Taxation Code defines a sale as 'Any transfer of title . . . in any manner or any means whatsoever.' Clearly, title passed from General to Pacific. In General's hands the title it possessed was title to personal property. General never had title as real property. What it had it passed to Pacific, and that was title to tangible personal property. That is all that is required by the act." (111 Cal.App.2d at p. 185; accord *Coast Elevator Co.* v. *State Bd. of Equalization, supra,* 44 Cal.App.3d 576 [components of elevator system installed as an integral part of building were personal property].)

A fortiori, the cranes installed by U.S. Lines were personal property. Before installation, the cranes consisted of movable personal property components owned by U.S. Lines. Upon completion of installation, the cranes became affixed to the land owned by the port. But the original character of the cranes as personal property does not evanesce by reason of their later classification as real property owned by the port. In the hands of U.S. Lines the cranes were tangible personal property.

Contrary to U.S. Lines's assertion, there is no meaningful distinction between this case and *Gen. Elec. Co.* or *Coast Elevator* by reason of the earlier date of physical installation herein. In both cases the seller installed

heavy equipment which became physically affixed to the property before title was passed. The decisive circumstance is not the time of transfer but the character of the property in the hands of the seller. In the two closely parallel cases, the courts held that notwithstanding classification as a real property "fixture" to the buyer, the equipment was personal property in the hands of the seller.

U.S. Lines contends, however, that in contrast to *Gen. Elec. Co.* and *Coast Elevator,* it possessed an equitable interest in the land perfected as a leasehold interest under the preferential assignment agreement; thus, the argument continues, U.S. Lines installed and sold the cranes to benefit its *own* estate.

Again, the difference is without legal significance. That U.S. Lines intended to affix the cranes to benefit its own interest in the property only means that it intended the annexation to become permanent obviating any right of removal in the absence of an express agreement. (Civ. Code, § 1013; see generally, 3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 65, p. 1671.) Such intent did not automatically convert the cranes from personal property into real property in the hands of U.S. Lines. Without an ownership interest in the subject land, U.S. Lines could not claim title to the cranes affixed to the real property. Its title to the cranes was as personal property, not real property.

Nor are we persuaded by U.S. Lines's related argument that the transfer of the cranes "in place" as affixed fixtures, without right of removal, rendered the transaction a nontaxable transfer of real property within the meaning of governing principles. In *Standard Oil Co.* v. *State Bd. of Equal., supra,* 232 Cal.App.2d 91, involving sale of a service station and leasehold which provided that all improvements and equipment installed on the land remained the personal property of the lessee, the question presented was whether the equipment (pumps, lifts, loading racks) transferred to the buyer (Standard Oil) "in place" was personal property for purposes of sales tax. In determining that a taxable transfer existed, the court focused on the buyer's right to remove the equipment notwithstanding its affixed status. "The equipment in the hands of the buyer—notwithstanding its affixation— was to be regarded at all times as personalty which the buyer could consume, remove, replace, and consume the replacement, etc., at its unrestrained will and pleasure." (232 Cal.2d at p. 96.)

Soon thereafter, the Board's promulgated administrative regulation 1596, subdivision (c)[6] patterned on the *Standard Oil* holding emphasizing the

---

[6]California Administrative Code, title 18, section 1596, subdivision (c) reads as follows:

lessee-seller's right of removal of affixed fixtures. Relying on regulation 1596, subdivision (c), U.S. Lines contends that since it has no right to remove the cranes from the "premises assigned," the transfer of the cranes "in place" was a transfer of real property and not a taxable transfer of personal property. The reliance is misplaced.

■ Under the governing regulation, a transfer "in place" plainly refers to a transfer of fixtures *along with the land*. A transfer "in place" constitutes a taxable sale of personal property only if the fixtures are expressly free to be removed, i.e., separated from the realty. By implication, if the fixtures are not free to be removed, they remain part of the realty, and the transfer is a sale of real property.

Here, however, U.S. Lines transferred only the cranes; the port already owned the land. Nor was U.S. Lines a "lessee-seller" in the complex transaction, a descriptive term referring to sale of a leasehold including assignment of fixtures transferred in place. At the time U.S. Lines sold the cranes to the port, it was neither a lessee nor lessee-seller. At the moment the several interrelated agreements became effective and U.S. Lines became a lessee of the land with certain preferential rights, it was no longer the owner or seller of the cranes.

In summary, the cranes were personal property in the hands of U.S. Lines even though after the transfer the cranes became real property fixtures annexed to the port's premises. Thus, the sale of the cranes to the port was a taxable transfer of tangible personal property.

## II.

### Measure of Tax

The Board measured the sales tax on the actual purchase price of the cranes computed under the terms of the crane purchase agreement, viz. $3.68 million. U.S. Lines contends the Board erred because the port ac-

"Fixtures, Machinery and Equipment, and Draperies Affixed to Real Property. The transfer 'in place' of affixed fixtures, machinery and equipment, or draperies is taxable as a sale of personal property when removal of the fixtures, machinery or equipment, or draperies by the seller or purchaser is contemplated by the contract of sale. The transfer 'in place' of affixed fixtures, machinery and equipment, or draperies owned by a lessee of land or buildings to which those items are affixed, is also taxable as a sale of personal property when the lessee-seller has the present right to remove the items either as trade fixtures under Section 1019 of the Civil Code or under the express terms of the lease."

tually paid "nothing" for the cranes. The contention borders on the frivolous.

Sales tax is measured by the seller's "gross receipts" (§ 6051) defined to mean "the total amount of the sale or lease . . . valued in money, *whether received in money or otherwise . . .*" (§ 6012, subd. (a), italics ours). ▮ While it is true that U.S. Lines received no cash payment under the terms of the crane purchase agreement, it expressly acknowledged receipt of equivalent full value in the port's execution of the crane lease,[7] which in turn was conditional upon the preferential assignment accorded U.S. Lines for use of wharf and berth areas.

Whatever business reasons or institutional requirements may have motivated the seemingly heuristic approach to a straightforward sale and leasing transaction, certainly U.S. Lines is bound by the arrangement selected. A taxpayer must accept the consequences of the form which has been chosen in a business transaction. (*W. E. Hall Co.* v. *Francise Tax Bd.* (1968) 260 Cal.App.2d 179, 184-185 [66 Cal.Rptr. 911]; see also *Simplicity Pattern Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 900, 915 [167 Cal.Rptr. 366, 615 P.2d 555].)

Having acknowledged receipt of valuable consideration in lieu of cash by virtue of the executed crane lease and attendant rights, it is unreasonable for U.S. Lines to now assert otherwise. The actual purchase price stated under the terms of the crane purchase agreement was a correct measure for calculation of the sales tax due. *Cedars-Sinai Medical Center* v. *State Bd. of Equalization, supra,* 162 Cal.App.3d 1182, upon which U.S. Lines relies, is factually distinguishable. In that case the court held that a sale and leaseback of medical equipment was a structured financing arrangement and not a "sale" subject to sales tax. The medical center bought medical equipment from vendors, paid the sales tax due, and subsequently transferred title to the equipment to leasing companies under a leaseback arrangement. The court reasonably construed the leaseback transactions as an alternative financing device and ultimately concluded "[t]here was but one sale of the equipment—by the vendors to plaintiff [medical center]." (*Id.,* at p. 1189.) Here, in contrast, there was only one "sale" and that was the transfer of the cranes from U.S. Lines to the port. Sales tax was properly assessed on the value of that sales transaction.

---

[7]Section 5 of the agreement provides, as pertinent: "Purchaser shall have no obligation to pay Seller in cash the actual purchase price [as] determined . . . . Instead of cash payment, Seller acknowledges and agrees that Purchaser's execution of the said Crane Lease and the rights granted thereunder to Seller constitute valuable consideration for said Cranes."

Judgment affirmed.

Newsom, J., and Holmdahl, J., concurred.