[No. B023104. Second Dist., Div. One. June 3, 1987.]

CHEMED CORPORATION, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

## Counsel

Ervin, Cohen & Jessup and Horace N. Freedman for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Richard E. Nielsen, Deputy Attorneys General, for Defendant and Appellant.

OPINION

LUCAS, J.—Plaintiff Chemed Corporation appeals from a judgment entered in favor of defendant State Board of Equalization (Board) in an action for a refund of sales tax and interest paid under protest. We affirm the judgment and dismiss a cross-appeal by the Board.

BACKGROUND

At a nonjury trial, the written decision of the State Board of Equalization hearing officer was received in evidence and the cause was then submitted upon a stipulation of facts.

Plaintiff Chemed Corporation (Chemed) is a Delaware corporation authorized to do business in California. The audit period involved is July 1, 1977, through June 30, 1980. During this period, Chemed engaged in business in California through four unincorporated divisions: DuBois Chemicals Division (DuBois); Dearborn Chemical Division (Dearborn); Vestal Laboratories Division (Vestal); and Medical Diagnostics Service Division (MDS). DuBois, Dearborn, and Vestal manufactured various products, were engaged in making retail sales in California and elsewhere, and were required to hold a California seller's permit with respect to such activity. Through MDS, Chemed was engaged in the business of providing medical testing services, such as blood sampling, for doctors and various health care institutions. MDS did not hold a California seller's permit.

Chemed through MDS operated testing laboratories in five different regions of the United States. At issue here is the sale of tangible personal property used at the Pacific Region (MDS-Pacific).

On October 12, 1978, Chemed sold all of the assets of the five MDS regions to Metpath Laboratory Corporation (Metpath), a wholly owned subsidiary of Metpath, Inc., a company unrelated to Chemed. Of the $11,086,597 selling price, $304,644 was allocated to the value of tangible personal property (exclusive of automobiles) physically located in California and used at MDS-Pacific. The sale of the tangible personal property was not reported as a taxable transaction for California sales tax purposes.

As a result of auditing Chemed's records, the Board determined a sales tax deficiency as of August 8, 1983, of which $19,801.86 in sales tax and interest thereon were attributed to the sale to Metpath of the tangible personal property used at MDS-Pacific. Chemed paid the assessment, exhausted all its administrative remedies, and then brought an action in the

superior court pursuant to Revenue and Taxation Code section 6933[1] to recover sales tax and interest it contends were erroneously assessed.

The trial court held that Chemed's sales of tangible personal property from all of its divisions in the year prior to the sale of MDS tangible personal property to Metpath, when combined with that sale to Metpath, constituted a series of sales sufficient in number, scope, and character to constitute an activity for which Chemed was required to hold a seller's permit, and that the sale of MDS-Pacific equipment was taxable on that basis. Chemed challenges this determination.

## DISCUSSION

It is clear that the transfer by Chemed to Metpath of the tangible personal property used at MDS-Pacific was a sale[2] at retail[3] and that the gross receipts from the sale were subject to the tax imposed by section 6051[4] unless the sale was an occasional sale under sections 6367 and 6006.5.

Section 6367 provides in pertinent part: "There are exempted from the taxes imposed by this part the gross receipts from occasional sales of tangible personal property ...."

At the time of the sale in issue, section 6006.5 provided in relevant part: " 'Occasional sale' includes: [¶] (a) A sale of property not held or used by a seller in the course of activities for which he is required to hold a seller's permit or permits if the activities were conducted in this state, provided such sale is not one of a series of sales sufficient in number, scope and character to constitute an activity for which he is required to hold a seller's permit or would be required to hold a seller's permit if the activity were conducted in this state ...."

Under the enforcement provisions of section 7051, the Board promulgated regulation 1595 (Cal. Admin. Code, tit. 18, § 1595 (regulation)) pertain-

[1] All references are to the Revenue and Taxation Code unless otherwise indicated.

[2] " 'Sale' means and includes: [¶] (a) Any transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration. ..." (Rev. & Tax. Code, § 6006.)

[3] "A 'retail sale' or 'sale at retail' means a sale for any purpose other than resale in the regular course of business in the form of tangible personal property. ..." (Rev. & Tax. Code, § 6007.)

" 'Retailer' includes: [¶] (a) Every seller who makes any retail sale or sales of tangible personal property. ..." (Rev. & Tax. Code, § 6015.)

[4] "For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers at the rate of ... 4¾ percent [after Mar. 31, 1974]." (Rev. & Tax. Code, § 6051.)

ing to the occasional sales exemption. At the time of the sale in question, this regulation provided in part: "Generally, a person who makes three or more sales for substantial amounts in a period of 12 months is required to hold a seller's permit...." (Reg. 1595, subd. (a)(1).)

On the basis that MDS marketed services rather than products, the Board did not claim that the tangible personal property used at MDS-Pacific and sold to Metpath was property held or used by Chemed in the retail sales of *products* made by Chemed through MDS. Nor did the Board claim that the property sold was property held or used by Chemed in the retail sales of *products* which were made by Chemed through its Dubois, Dearborn, or Vestal divisions. Therefore, the first portion[5] of 6006.5, subdivision (a) (hereinafter, 6006.5(a)) is not in issue.

However, the Board asserted and the trial court found, that Chemed was the seller of the MDS-Pacific *tangible personal property* and therefore all sales within the preceding 12 months of tangible personal property used by any of Chemed's divisions or subdivisions (regions) were includable in determining whether there was a series of sales sufficient in number, scope and character to constitute an activity for which Chemed is required to hold a seller's permit. On this basis, the trial court found that there had been such sales.

In its appeal, Chemed contends that the activities of its MDS division were separate and autonomous from those of its DuBois, Dearborn, and Vestal divisions. Further, Chemed contends that the activities of MDS-Pacific were separate and autonomous from those of the four other MDS regions: Ohio Valley Region; Great Lakes Region; Rocky Mountain Region; and Southwest Region. Based on this characterization of MDS-Pacific, Chemed argues that the sale of the MDS-Pacific tangible personal property was an activity solely of MDS-Pacific and cannot be combined with like sales by the other regions of MDS or by the other divisions of Chemed to create a series of sales under the 6006.5(a) sale, second portion.

First, Chemed argues that an analysis of the language of 6006.5(a) discloses that only sales by the specific entity are to be considered. Again, this section provides in pertinent part: " 'Occasional sale' includes: [¶] (a) [first portion] A *sale of property not held or used by a seller in the course of*

---

[5] In discussing section 6006.5(a), we adopt the "first portion" and "second portion" terminology of the parties as follows: " 'Occasional sale' includes: (a) [*first portion:*] A sale of property not held or used by a seller in the course of activities for which he is required to hold a seller's permit ... , [*second portion:*] provided such sale is not one of a series of sales sufficient in number, scope and character to constitute an activity for which he is required to hold a seller's permit...."

*activities for which he is required to hold a seller's permit* ... [second portion] provided *such sale* is not one of a series of sales sufficient in number, scope and character to constitute an activity for which he is required to hold a seller's permit ....'" (Italics supplied.)

Chemed argues that *such sale* in the second portion can only refer to *sale of property* in the first portion. This is the plain meaning of the language and a reasonable interpretation which should be followed. (*Gaillard* v. *Natomas Co.* (1985) 173 Cal.App.3d 410, 414 [219 Cal.Rptr. 74].) However, Chemed concludes: "It thus follows, that the only sales to be considered in determining whether "such sale' is one of a series of sales sufficient in number, scope and character, are those sales referred to in the first portion of section 6006.5(a)[,] i.e., *those sales made by the specific activity involved, here MDS.*" (Italics supplied.) Chemed further argues that MDS-Pacific was operated as a separate, autonomous region of MDS and therefore the sales of tangible personal property by other MDS regions should not be attributed to MDS-Pacific. Chemed thus equates the activity of selling MDS-Pacific tangible personal property solely with the entity MDS-Pacific. Under this analysis, there was but *one* sale—that of the MDS-Pacific tangible personal property—which by definition could not have been one of a series sufficient to impose the tax in issue.

The language of 6006.5(a) does not support Chemed's conclusion. Section 6006.5(a) refers to "seller" without regard to the business structure of the seller. Furthermore, Chemed has stipulated that it was the seller of the MDS-Pacific tangible personal property: "On or about October 12, 1978, Chemed sold all of the assets used at MDS to Metpath Laboratory Corporation ...." During the 12 months preceding the sale in issue, Chemed was also the seller of tangible personal property used at the MDS-Ohio Valley Region and used at some of its other divisions. The plain meaning of the language of section 6006.5(a) provides no basis on which to segregate Chemed's sale of the tangible personal property used at MDS-Pacific from like sales of property used at another region and at other divisions.

Chemed contends that two versions of regulation 1595 show that the Board intended to treat service enterprises differently from other businesses and support Chemed's argument that only the sales of the equipment used at MDS-Pacific, an unincorporated subdivision of Chemed, may be looked at to determine whether there was a series of sales.[6] Nowhere in the regulation is there language referring to the business structure of the seller.

---

[6] At the time of the sale to Metpath, regulation 1595 set out examples of sales which would result in the seller being required to hold a seller's permit and thus the sales thereunder being taxed. Subdivision (d) provided: "Service Enterprises. A person engaged in a service enterprise is not liable for sales tax measured by his receipts from a retail sale of equipment used in

Chemed infers support for its position from the Board's apparent sole reliance on sales of equipment used by the MDS Division. Chemed reasons that this shows the Board's understanding that the only transactions to be considered were those of MDS. A reading of the Board's decision discloses that it was aware that among the factors considered by the auditor in ascertaining the tax were that even though MDS was a service division, DuBois, Dearborn, and Vestal were making sales and were required to be "permitized" and that Chemed itself had a permit. The Board determined that MDS Division had made enough sales to be required to hold a seller's permit itself.[7] There was simply no need for the Board to look any further for qualifying sales.

Finally, Chemed cites *Ontario Community Foundations, Inc.* v. *State Bd. of Equalization, supra,* 35 Cal.3d 811, in support of its position that the Board should only look to sales by the specific activity to ascertain whether a sale is one of a series. In *Ontario,* two corporations which had sold their hospitals were assessed sales tax on hospital equipment which had been used in rendering medical and nursing services. Each corporation was involved in other activities requiring a seller's permit, namely, cafeteria sales to nonpatients, and a small, nonexempt portion of their pharmacy and hospital supply sales. The Board based its assessment on a "unitary busi-

---

the conduct of the service enterprise even though he may have made a series of trade-ins of old equipment for new, incidental to his business. The sale of the equipment in question is not regarded as one of a series of sales, or the equipment as having been used in a selling activity, and thus the sale is an occasional sale. [¶] If, however, in addition to the sale in question, the person has made two or more sales of substantial amounts in a period of 12 months, the sale is taxable even though the other sales were sales for resale."

The language presently in effect regarding the example of a service enterprise is found in regulation 1595, subdivision (a)(5)(A): "1. Operators of service enterprises such as hospitals, hotels, theaters, schools, laundromats, car washes, transportation companies, and trucking companies may make some sales incidental to their primary service business. A hospital may operate a pharmacy and cafeteria as an adjunct to the hospital. A hotel may operate a restaurant and a bar. A theater may sell popcorn to patrons. A school may operate a cafeteria and bookstore. A laundromat may sell soap to its customers. [¶] If any of these businesses were sold, tax would apply only to the gross receipts from the tangible personal property held or used in the selling activity. [¶] 2. If, in any 12 month period, the operator of the service enterprise makes more than two sales in substantial amounts of tangible personal property used in the service enterprise, the gross receipts from those sales is [*sic*] subject to tax, unless otherwise exempt (such as a sale in interstate commerce). If one of the sales is a sale of the business, the tax applies to the gross receipts from the sale of the tangible personal property. In determining whether there are more than two sales of tangible personal property, trade-ins of used equipment for new, incidental to the service enterprise, will not be counted."

There is no indication that the examples given in either version are of service enterprises which are part of a larger, nonservice entity.

[7] The Board also determined that even if the MDS Division had not made enough sales to require it to hold a seller's permit, under the "unitary business" concept of regulation 1595 there was a sufficient number of sales to require MDS to hold a seller's permit. The unitary business concept was disallowed in *Ontario Community Foundations, Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811 [201 Cal.Rptr. 165, 678 P.2d 378].

ness" concept embodied in regulation 1595 as it existed at that time. This concept provided that if the seller were engaged in sales which were subject to the tax, its otherwise exempt sales were also taxable. The court held that this regulation was invalid because it eliminated the occasional sales exemption which was otherwise available to the sellers under section 6006.5.

The court noted that the occasional sale exemption of 6006.5 applied to the sellers because at no time was the subject personalty directly or indirectly used by the hospitals in the course of activities for which they were required to hold a seller's permit [first portion of 6006.5(a)], "[n]or was the single sale by each hospital of its equipment and furnishings, in connection with the sale of its entire business and the real property upon which it was located, 'one of a series' of such sales which *independently* might require a permit under the statute [second portion]." (At p. 815; italics supplied.) In discussing the Board's application of regulation 1595 the court stated, "[The Board] would thus read the regulation as being contrary to the apparent import of section 6006.5, thereby depriving each plaintiff of a sales tax exemption for an 'occasional sale,' to wit: a sale of personalty *not* held in the course of activities for which a seller's permit was required, and not one of a series of similar sales which *independently* might require such a permit." (At pp. 815-816, second italics supplied.) It is clear that the court in *Ontario* interpreted "one of a series" to be a separate, independent test. This series of sales test of the second portion of 6006.5(a) looks to see if the seller involved has conducted a series of similar sales and whether that series by itself constitutes an activity requiring the holding of a seller's permit.

■ "Exemptions from taxation must be found in the statute." (*Market St. Ry. Co.* v. *Cal. St. Bd. Equal.* (1955) 137 Cal.App.2d 87, 96 [290 P.2d 20].) Section 6006.5 refers to the "seller," and the seller in the case at bar is Chemed. Section 6006.5(a) does not distinguish between a seller and its subdivision at which the equipment was used. Tax exemptions are strictly construed against the taxpayer. (*Santa Fe Transp.* v. *State Board of Equal.* (1959) 51 Cal.2d 531, 539 [334 P.2d 907].) " '[I]t is held that "settled principles of statutory construction require that any doubt be resolved against the right to the exemption. . . ." [Citations].' " (*Standard Oil Co.* v. *State Bd. of Equalization* (1974) 39 Cal.App.3d 765, 769-770 [114 Cal.Rptr. 571].) ■ "While for reasons considered desirable [a] plaintiff corporation may departmentalize its business, it cannot by such process set up for tax purposes a distinction between the types or kinds of sales made by it where the effect would be to cause some of its sales to escape the tax aimed at all of such sales. Specific sales of a retailer cannot be segregated from the bulk of its sales and treated separately as isolated or occasional sales." (*N. W. Pac. R. R.* v. *St. Bd. of Equalization* (1943) 21 Cal.2d 524, 529 [133 P.2d 400].) ■ We are not persuaded that in determining whether there has

been a series of sales which require a seller's permit, and thus result in sales tax liability, the Board is restricted to considering only those sales of equipment used at a particular unincorporated subdivision of the corporate seller.

## CROSS-APPEAL

The trial court found that five sales of equipment used at MDS-Ohio Valley Region dated November 1977 constituted a single sale and that another sale was insubstantial. The Board disagrees with this finding and contends that even if the series of sales test were limited to sales of assets used by the MDS Division, the resulting series would be sufficient to deny the occasional sale exemption to the Metpath sale. Given our affirmance of the judgment, we do not reach this issue.

## DISPOSITION

The judgment is affirmed and the cross-appeal is dismissed. Costs on appeal are awarded to respondent Board.

Hanson (Thaxton), Acting P. J., and Devich, J., concurred.

The petition of plaintiff and appellant for review by the Supreme Court was denied August 12, 1987. Kaufman, J., was of the opinion that the petition should be granted.