[No. A036858. First Dist., Div. Five. Aug. 16, 1988.]

TOUCHE ROSS & CO., Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

**COUNSEL**

Pettit & Martin, Theodore Russell, David J. Neuman, Philip F. Atkins-Patterson and Patrick O'Donnell for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and Timothy G. Laddish, Deputy Attorney General, for Defendant and Appellant.

**OPINION**

**HANING, Acting P. J.**—Touche Ross & Co. (hereafter Touche Ross) filed an action pursuant to Revenue and Taxation Code section 6934 for recovery of sales taxes and interest paid under protest to the State Board of Equalization (Board) upon the sale of a business.[1] On the parties' cross-motions for summary judgment, the trial court held in favor of Touche Ross on its claim that certain computer programs included as part of the

---

[1] Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

sale were exempt from sales tax under section 6010.9. The court held in favor of the Board on its contention that the sale was not an exempt "occasional sale" under section 6006.5, subdivision (a). Both parties appeal.

## FACTS

■■■■ The facts are stipulated.[2] On April 20, 1977, Kaiser Industries Corporation (KIC), a Nevada corporation, adopted a voluntary plan of complete liquidation. Touche Ross, which had served since 1947 as KIC's independent accountant, was selected as liquidation agent. At the time it adopted its liquidation plan, KIC had three unincorporated divisions: Kaiser Engineers (KE), which provided engineering services in connection with commercial construction projects; Kaiser Sand and Gravel (KSG), which engaged primarily in excavation and retail sale of sand, gravel, and concrete; and the General Office Division, which provided administrative services. The liquidation plan provided for the total liquidation of all assets of KIC. The issues arise principally from the June 1977 sale of the assets of the KE division to Raymond International, Inc.

In the course of providing engineering and construction services to its clients, the KE division utilized an IBM system 370/158 computer and maintained an extensive library of customized computer programs, or software, which had been developed for internal business use by KE's own staff to support its engineering services. At the time of the sale to Raymond International this software library was valued at approximately $4.3 million. Also included in the sale were such assets as office equipment, furniture, and computer equipment, valued at approximately $1.5 million. Touche Ross did not report the sale of these assets as taxable transactions for California sales tax purposes. In addition to the sale to Raymond International, KIC also made numerous sales to other parties over an extensive period during the liquidation process.

The Board completed an audit of Touche Ross's records and sent a Notice of Determination stating that a deficiency in sales tax, plus interest, was due. After Touche Ross's petition for redetermination was denied, it paid the amounts under protest, and commenced this action for recovery. (See § 6934.)

The parties present two issues: (1) whether the sale of the software library constitutes an exempt service transaction under section 6010.9, and (2)

---

[2] When the facts are uncontradicted, interpretation of sales and use tax statutes is purely a question of law and we make our own judgment independent of the trial court's determination. (*Parfums-Corday, Inc.* v. *State Bd. of Equalization* (1986) 187 Cal.App.3d 630, 637 [232 Cal.Rptr. 56]; *United States Lines, Inc.* v. *State Bd. of Equalization* (1986) 182 Cal.App.3d 529, 534 [227 Cal.Rptr. 347].)

whether the sale to Raymond International qualifies under the "occasional sale" exemption of sections 6367 and 6006.5, subdivision (a), in light of the other sales made during the liquidation.

## CUSTOM COMPUTER PROGRAMS

■■■ The Board contends that the sale of the software library to Raymond International is not excluded from sales tax under section 6010.9. Section 6010.9 provides that "the design, development, writing, translation, fabrication, lease, or transfer for a consideration of title or possession, of a custom computer program" is not subject to sales tax. A "custom computer program" is defined as a "computer program prepared to the special order of the customer and includes those services represented by separately stated charges for modifications to an existing prewritten program which are prepared to the special order of the customer. The term does not include a 'canned' or prewritten computer program which is held or existing for general or repeated sale or lease, even if the prewritten or 'canned' program was initially developed on a custom basis or for in-house use. Modification to an existing prewritten program to meet the customer's needs is custom computer programming only to the extent of the modification." (§ 6010.9, subd. (d).)

The Board maintains that the statutory language defining a "custom computer program" as one "prepared to the special order of the customer," must be interpreted as referring to a customer in the ordinary sense. Thus, the Board argues, because KE's software library was not originally prepared to the special order of Raymond International, the sale thereof is not exempt from taxation by section 6010.9. The Board invokes the rule that tax exemptions are to be strictly construed against the taxpayer. (*Santa Fe Transp.* v. *State Board of Equal.* (1959) 51 Cal.2d 531, 539 [334 P.2d 907]; *Standard Oil Co.* v. *State Bd. of Equalization* (1974) 39 Cal.App.3d 765, 769-770 [114 Cal.Rptr. 571].)

Touche Ross responds that section 6010.9 is not an exemption statute, and argues the general rule that tax laws are to be strictly construed in favor of the taxpayer. (*Barker Bros., Inc.* v. *Los Angeles* (1938) 10 Cal.2d 603, 608 [76 P.2d 97]; *Knudson Dairy Products Co.* v. *State Bd. of Equalization* (1970) 12 Cal.App.3d 47, 52 [90 Cal.Rptr. 533].)

■■■ The first rule of statutory interpretation is to determine legislative intent (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]), and in this instance the Legislature has provided guidance: "It is therefore the intent of the Legislature in enacting this act to clarify the imposition, payment, and collection of the sales and use taxes *for those individuals and entities engaged in the development and*

*maintenance of computer software."* (Stats. 1982, ch. 1274, § 1, p. 4706, italics added.) "The Legislature finds and declares that sales and service of custom computer programs, as defined in Section 6010.9 of the Revenue and Taxation Code, other than basic operational programs, are *service transactions* not subject to sales or use taxes under *any existing state law.* The use of any storage media in the transfer of custom computer programs is only incidental to the true object of the transaction, which is *the performance of a service.* Therefore, the Legislature, consistent with the statement of intent in Chapter 165 of the Statutes of 1972, declares that [section 6010.9] *is declaratory of, and not a change in, existing law."* (*Id.,* § 4, p. 4707, italics added.)[3] The Legislature further declared that the purpose of the act was "assuring equity in the payment of sales and use taxes *among retailers selling and servicing custom computer programs . . . ."* (*Id.,* § 5, p. 4707, italics added.)

In light of the legislative declaration that section 6010.9 was meant to be declaratory of, rather than a change in existing law, a review of the law in existence at the time section 6010.9 was enacted is necessary. As a general rule, sales taxes are imposed on retail sales of tangible personal property (§§ 6011, subd. (a), 6051) and not on the performance of services. (§§ 6007, 6011, subd. (c)(3), 6012, subd. (c)(3); *Gen. Elec. Co.* v. *State Bd. of Equalization* (1952) 111 Cal.App.2d 180, 185-186 [244 P.2d 427].) Since many sales transactions contain both product and service components, the courts utilize the "true object" test in defining them. That test is found in California Code of Regulations (formerly California Administrative Code) title 18, section 1501: "Persons engaged in the business of rendering service are consumers, not retailers, of the tangible personal property which they use incidentally in rendering the service. . . . [¶] The basic distinction in determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract; that is, is the real object sought by the buyer the service per se or the property produced by the service. If the true object of the contract is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred." (See *Simplicity Pattern Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 900, 907-908 [167 Cal.Rptr. 366, 615 P.2d 555]; *Bar Master, Inc.* v. *State Bd. of Equalization* (1976) 65 Cal.App.3d 408, 413-414 [135 Cal.Rptr. 272]; *Albers* v. *State Board of Equalization* (1965) 237 Cal.App.2d 494, 497 [47 Cal.Rptr. 69].) A service has been defined as the " 'performance of labor for the benefit of another.' " (*Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 96 [130 Cal.Rptr.

---

[3] Chapter 165 of the Statutes of 1972 adds sections 995 and 995.1 to the Revenue and Taxation Code, and declares that, with the exception of basic operational programs, computer programs are not subject to property tax.

321, 550 P.2d 593], quoting Webster's New Internat. Dict. (2d ed. unabridged).)

■ The ascertainment of the true object of the transaction at issue herein leads to the conclusion that Raymond International sought to acquire title and possession of numerous KIC assets, including the software library as it then existed, without requiring any performance of labor or service from KIC. Indeed, Touche Ross and the Board have stipulated that "[n]o computer programs were prepared by the KE division to the special order of any other party, and none were prepared to the special order of or for projects for Raymond International, Inc."

At the time section 6010.9 was enacted the Legislature had also exempted certain general categories as well as specific products and transactions from sales and use tax, and had not included any form of computer programs therein (§ 6351 et seq.), although it had done so in the area of personal property taxes. (§ 995.) ■ In light of the Legislature's declared intent that section 6010.9 was declarative of, rather than a change in existing law, the absence of a preexisting exemption supports the position that no new exemption was created.

■ Touche Ross concedes that section 6010.9 does not create an exemption, but contends, nevertheless, that it excludes the sale of the software library herein from the imposition of sales taxes by classifying the sale as a service transaction. This interpretation of the statute fails to consider the entire expression of legislative intent. Touche Ross's argument does not distinguish between the service component of the original design and development process, and the ultimate product which has been developed. (See, e.g., Cal. Code Regs., tit. 18, § 1501.) If we follow Touche Ross's argument to its ultimate conclusion, once a custom computer program has been developed and delivered to the initial customer it is forever shielded in the stream of commerce from sales tax, regardless of the number of subsequent sales of that single program, or the remoteness thereof from the original programmer or developer.

Section 6010.9 defines a "custom computer program" as one which has been "prepared to the special order of the customer." The software library sold herein was not prepared to the special order of Raymond International, and the parties have so stipulated. The legislative intent was to "clarify the imposition, payment, and collection of the sales and use taxes *for those individuals and entities engaged in the development and maintenance of computer software*." (Stats. 1982, ch. 1274, § 1, italics ours.) The enactment declares "the public purpose of assuring equity in the payment of sales and use taxes among *retailers selling and servicing custom computer programs* . . . ." (*Id.,* at § 5, italics ours.) KIC was not engaged in "the development

and maintenance of computer software," nor was it a "retailer selling and servicing custom computer programs." The parties have stipulated that "[t]he KE division was engaged primarily in the business of providing engineering services in connection with commercial construction projects."

In the enactment of section 6010.9 the Legislature has recognized that the design, development or creation of a custom computer program to the special order of a customer is primarily a service transaction and, for that reason, not subject to sales tax. However, once the program has been created and in the possession of the original customer, the design or development service has been completed, and the program itself has become a tangible personal asset of the customer. A subsequent sale of that program by the initial customer can no longer be characterized as a "service" transaction, but rather is a transfer of a tangible personal asset produced by the original programmer's services. As such, it is subject to sales tax. (§ 6051.)

Were we to conclude otherwise and accept Touche Ross's position, any entrepreneur could purchase KE's entire software library, sell off the individual programs one at a time, reap a handsome profit, and pay no sales tax thereon. We do not believe the Legislature intended such a result when it enacted section 6010.9. Exempting such sales from taxation would constitute a change in the law, contrary to the express declaration to the contrary. Rather, we conclude that section 6010.9 recognizes, in accordance with existing law, that those individuals and entities engaged in the design, development and maintenance of custom computer programs prepared to the special orders of their customers, are engaged in a service industry and that those services are not subject to sales and use taxes.

Our conclusion does not contradict the Legislature's declaration that "it is in the public interest to provide in this state incentives for the development and utilization of computer software" (Stats. 1982, ch. 1274, § 1, p. 4706), nor does it stifle "research and an expansion of business activity within the state." (Stats. 1972, ch. 165, § 2, p. 385 [exempting certain computer programs from personal property taxes].) It is consistent with the Legislature's desire to clarify the service aspect of the function performed by "individuals and entities engaged in the development and maintenance of computer software" (Stats. 1982, ch. 1274, § 1, p. 4706), and "of assuring equity in the payment of sales and use taxes among retailers selling and servicing custom computer programs . . . ." (*Id.,* § 5, p. 4707.) The development and sale of custom computer programs designed to the special order of the original customer remain free from sales and use taxes under section 6010.9. They are also exempt from property taxation under section 995. Further, in the ordinary course of business, most secondary sales of custom computer programs designed to the special order of the selling party

will come within the occasional sale exemption created by sections 6367 and 6006.5, subdivision (a).

## OCCASIONAL SALE

■ Touche Ross contends in its cross-appeal that the sale of the assets at issue (including the library of computer programs) to Raymond International is an exempt "occasional sale" under section 6006.5, subdivision (a). Section 6367 provides that a sale of otherwise taxable property is not subject to sales tax if it constitutes an "occasional sale." An "occasional sale" is defined as a "sale of property not held or used by a seller in the course of activities for which he or she is required to hold a seller's permit . . . provided that the sale is not one of a series of sales sufficient in number, scope and character to constitute an activity for which he or she is required to hold a seller's permit . . . ." (§ 6006.5, subd. (a).) This definition is elaborated in the Sales and Use Tax Regulations, which provide: "Generally, a person who makes three or more sales for substantial amounts in a period of 12 months is required to hold a seller's permit. A person who makes a substantial number of sales for relatively small amounts is also required to hold a seller's permit." (18 Cal. Code Regs., tit. 18, § 1595, subd. (a)(1).)

Thus, regardless of other considerations, the occasional sale exemption is lost if, in addition to the sale in issue, KIC made more than two sales of a substantial amount, or a substantial number of smaller sales within a twelve-month period. ■ "It is not required that the principal business activity of the taxpayer shall involve making retail sales of tangible personal property if, in fact, the retail sales of tangible personal property made by the taxpayer are sufficient in number, scope and character to make the taxpayer a retailer under the provisions of the Revenue and Taxation Code. [Citations.]" (*Hotel Del Coronado Corp.* v. *State Board of Equalization* (1971) 15 Cal.App.3d 612, 619-620 [92 Cal.Rptr. 456].) ■ The parties agree that " '[t]he applicability of the occasional sale exemption to the KE sale depends solely on whether it is one of a "series of sales" that would otherwise require the holding of a seller's permit.' "

It is undisputed that during the year prior to the sale in issue, there were four sales of tangible personal assets held by the KE division in the following amounts: $300, $75, $250, and $70. Touche Ross argues that "these four *de minimus* sales, considered alone," would not defeat its right to the "occasional sale" exemption. However, the Board does not rely solely on the sales of property from the KE division in arguing that the prior sales were sufficient in number, scope and character to disqualify the sale at issue from sales tax exemption as an "occasional sale." The Board takes the position that it is entitled to consider sales of property of a similar character

from KIC's other divisions, in determining whether there has been a series of sales that would subject them to sales tax liability.

When similar sales made by KIC are considered, they are quite substantial, both in individual amounts and total number of sales. For example, during the year before the sale in issue, KIC made 39 other sales of personal property, with 32 over $100 each, 19 over $1,000, and several in more substantial amounts, for example, $4,000, $5,670, $6,500, $7,717, $8,775, $9,000, $9,500, $10,792, $30,000, and $71,977. It is undisputed that if all sales are considered, the resulting total is sufficient to deny the occasional sale exemption to the sale of the KE division assets.

The Board's position in this matter is supported by *Chemed Corp. v. State Bd. of Equalization* (1987) 192 Cal.App.3d 967 [237 Cal.Rptr. 627], a case decided while this appeal was pending. *Chemed* was an action brought by a Delaware corporation claiming that sales tax had been improperly assessed on the sale of tangible personal property used in one of its California-based unincorporated divisions. The division in question marketed services rather than products, and its activities did not require the holding of a California seller's permit. However, Chemed's three other California-based divisions were heavily engaged in retail sales, and all three divisions were required to hold California seller's permits. Chemed argued that the Board should be limited to examining the sales activities of only its services division in determining whether the sale was one of a series under section 6006.5, subdivision (a).

The *Chemed* court disagreed, concluding the Board was entitled to consider the sales of similar property by all of Chemed's unincorporated divisions in determining whether the sale in question was one of a series that required a seller's permit and thus resulted in sales tax liability under section 6006.5, subdivision (a). The *Chemed* court explained: " 'While for reasons considered desirable [a] plaintiff corporation may departmentalize its business, it cannot by such process set up for tax purposes a distinction between the types or kinds of sales made by it where the effect would be to cause some of its sales to escape the tax aimed at all of such sales. Specific sales of a retailer cannot be segregated from the bulk of its sales and treated separately as isolated or occasional sales.' " (*Chemed, supra*, 192 Cal.App.3d at p. 974, quoting *N. W. Pac. R. R. v. St. Bd. of Equalization* (1943) 21 Cal.2d 524, 529 [133 P.2d 400].)

Touche Ross admits, as it must, that if this court follows *Chemed* and allows the Board to consider similar sales made by KIC, the denial of the "occasional sale" exemption is a foregone conclusion. However, Touche Ross argues that the *Chemed* decision is "fundamentally flawed and should not be followed." Touche Ross seeks to avoid the application of *Chemed* by

arguing that it runs contrary to the principles announced by the California Supreme Court in *Ontario Community Foundations, Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811 [201 Cal.Rptr. 165, 678 P.2d 378]. *Ontario* held that the solitary, one-time sale of tangible personal property not held in the course of activities of the seller for which it was required to hold a seller's permit was entitled to the occasional sale exemption from sales tax. However, the Supreme Court repeatedly emphasized that the sale under scrutiny was a single, isolated sale and was *not* one of a series of similar sales which might independently deprive the seller of the tax exemption set out in section 6006.5, subdivision (a) for "occasional sales." (*Id.,* at pp. 815, 816, 818.) Since the liquidation sale at issue herein was determined to be taxable because of the number, scope and character of other sales made during the year prior to the sale in question, *Ontario* neither impairs nor conflicts with *Chemed's* reasoning. The *Chemed* court arrived at the same conclusion. (*Chemed Corp.* v. *State Bd. of Equalization, supra,* 192 Cal.App.3d at p. 974.)

We agree with *Chemed's* analysis. The mere fact that a corporate entity is subdivided into unincorporated departments or divisions does not transform those departments or divisions into separate legal entities for tax purposes. The undisputed evidence demonstrates that the sale in question was one of a series of sales sufficient in number, scope and character to constitute activity requiring the holding of a seller's permit, and was therefore not an "occasional sale."

That portion of the summary judgment in favor of the Board is affirmed. That portion in favor of Touche Ross is reversed and remanded with instructions to enter judgment in favor of the State Board of Equalization.[4] Any interest due or overpaid shall be adjusted by the trial court.

King, J., and Newsom, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied November 9, 1988.

---

[4] "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

* Assigned by the Chairperson of the Judicial Council.