[No. S032195. Nov. 28, 1994.]

NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION et al., Plaintiffs and Appellants, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

**COUNSEL**

Pillsbury, Madison & Sutro, C. Douglas Floyd, Jeffrey M. Vesely and Craig A. Becker for Plaintiffs and Appellants.

Elizabeth C. Burton and Kendall L. Houghton as Amici Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, and Richard F. Finn, Deputy Attorney General, for Defendant and Respondent.

## OPINION

KENNARD, J.—California imposes a sales tax on the retail sale of tangible personal property (Rev. & Tax. Code, § 6051),[1] but excludes from taxation the transfer of intangible property and the transfer of a "custom computer program" (§ 6010.9). The issues here are:

1. When a company's trade secrets or other intellectual work product are embodied in documents, is the sale of those documents a transfer of tangible personal property and thus taxable, or does the intellectual content of the documents render the sale a nontaxable transfer of intangible property?

2. When a company develops a computer program for its own use and later sells the program, is the sale nontaxable as the transfer of a "custom" computer program?

As explained below, we conclude that in both of these instances the sale of the property is a taxable event.

### I.

In 1981, Navistar International Transportation Corporation (Navistar), then known as International Harvester Company, sold all of the assets of its Solar Division to Solar Turbines, Inc., a wholly owned subsidiary of Caterpillar Inc. (Caterpillar), for $505 million. Navistar's Solar Division was at that time a leading manufacturer of industrial turbine engines. The design and production of industrial turbine engines is a technologically sophisticated process involving a number of trade secrets and other intellectual work product.

At the time of the sale, Navistar and Caterpillar agreed to allocate the purchase price among the various assets to be transferred. The assets that are

[1]All further statutory references are to the Revenue and Taxation Code, unless otherwise indicated.

the subject of the tax dispute in this case fall into three categories: drawings and designs, manuals and procedures, and computer programs.[2]

### Drawings and Designs

The drawings and designs at issue here embodied the technology developed by Navistar's Solar Division for the manufacture of turbines. They set forth confidential trade secrets and depicted patented components. They were proprietary to the Solar Division and were the subject of strict in-house security.

Experimental engineers created the drawings and designs from which manufacturing engineers produced a series of shop drawings, known as operational instruction sheets, which detailed the manufacturing process of the turbine engines. These operational instruction sheets enabled machine operators to fabricate the appropriate parts.

### Manuals and Procedures

The manuals and procedures involved in the sale contained the engineering specifications prepared by Navistar's Solar Division engineers, who used them as technical guidelines. Like the drawings and designs, they reflected the turbine technology developed by Navistar's Solar Division over a period of many years, they contained trade secrets, they were proprietary to the Solar Division, and they were the subject of rigorous in-house security.

### Computer Programs

The computer programs at issue here had been developed by Navistar's Solar Division for use in its own business. Approximately 74 percent of the programs were business system programs pertaining to financial accounting, business operation planning, and economic forecasting; roughly 18 percent of the programs were engineering programs, such as design and testing programs; and approximately 8 percent of the programs were "distributed computing systems," such as computer-aided design programs, basic research programs, and programs that controlled automated machinery operations. The computer programs also contained trade secrets.

---

[2]Throughout this proceeding, the parties have used the terms "computer procedures" and "computer programs" interchangeably to designate the same group of assets. To avoid confusion, we use only the term "computer programs."

The board did not impose any tax on patents, patent applications, licenses and agreements, order backlog, assembled work force or trademarks. The assets that are the subject of dispute in this case do not include patents or copyrights.

After the sale of its Solar Division to Caterpillar, Navistar filed a sales and use tax return for the third quarter of 1981. Following its audit in 1984 of Navistar's return, the State Board of Equalization (hereafter Board) determined that, contrary to Navistar's position, the drawings and designs, the manuals and procedures, and the written computer programs that Navistar had sold to Caterpillar were tangible personal property subject to sales tax. The Board assessed a deficiency.

In November 1986, after the Board's denial of Navistar's "Petition for Redetermination," Navistar paid the Board the assessed deficiency. In May 1987, Navistar requested a refund, which the Board denied. Thereafter, Navistar, Caterpillar and Solar Turbines, Inc. (Caterpillar's wholly owned subsidiary) filed in the superior court this action for a refund.[3] The court ruled in favor of the Board. The court found that the drawings and designs, the manuals and procedures, and the computer programs were tangible personal property that had been transferred as part of a sale and therefore were taxable.

Following the Court of Appeal's affirmance of the trial court's judgment, we granted Navistar's petition for review. Navistar contends that the sale of its drawings and designs, as well as its manuals and procedures, was a transfer of nontaxable intangible assets. According to Navistar, when the objective of a purchaser is primarily to acquire the intellectual content embodied in a physical object, such as a document, the sale is not taxable even though the physical object itself is tangible personal property that otherwise would be taxable under section 6051. With regard to the sale of the computer software, Navistar contends it was "custom" software and therefore not taxable under section 6010.9, which exempts custom computer programs from taxation.

## II.

California law imposes a tax on the retail sale of tangible personal property (§ 6051), but not on the sale of intangible personal property or on the performance of services (see §§ 6006, 6007).

Of these three concepts, only tangible personal property is defined by statute. It means "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." (§ 6016.)

---

[3] For convenience, these plaintiffs will be referred to simply as Navistar throughout this opinion. Navistar has agreed with Caterpillar and Solar Turbines, Inc., to disclaim any interest in the amounts it seeks in this action, and has further agreed that any refund is to be made directly to Solar Turbines, Inc., as the real party in interest.

■ Although there appears to be no comprehensive definition of intangible property (Cowdrey, *Software and Sales Taxes: The Illusory Intangible* (1983) 63 B.U.L. Rev. 181, 200-203), such property is generally defined as property that is a "right" rather than a physical object. (*Roth Drug, Inc.* v. *Johnson* (1936) 13 Cal.App.2d 720, 734 [57 P.2d 1022]; Black's Law Dict. (6th ed. 1990) p. 809, col. 1.) As the court in *Roth Drug, Inc.* v. *Johnson, supra*, 13 Cal.App.2d at page 734 observed: "Tangible property is that which is visible and corporeal, having substance and body as contrasted with incorporeal property rights such as franchises, choses in action, copyrights, the circulation of a newspaper, annuities and the like." An intangible right may be evidenced or represented by a physical object such as a promissory note or a certificate of stock. When an intangible right is so represented, the physical object representing the particular right, while capable of perception by the senses, is nevertheless considered intangible property for tax purposes. Thus, for purposes of the law of taxation, intangible property is defined as including personal property that is not itself intrinsically valuable, but that derives its value from what it represents or evidences. (See, e.g., Fla. Stat. Ann. § 199.023, subd. (1) (West 1994); *Dilley* v. *Ketchikan Gateway Borough* (Alaska 1993) 855 P.2d 1335, 1336-1337; Black's Law Dict., *supra*, p. 809, col. 1.)

The third concept, service, has been defined by this court as the performance of labor for the benefit of another. (*Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 96 [130 Cal.Rptr. 321, 550 P.2d 593].)

When the transferred or sold assets involve not only tangible personal property, which is taxable, but also the performance of a service, which is not taxable, their classification is determined by the "true object" test as set forth in title 18, California Code of Regulations, section 1501 (regulation 1501): "The basic distinction in determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract; that is, is the real object sought by the buyer the service per se or the property produced by the service. If the true object of the contract is the service per se, the transaction is not subject to tax even though some tangible property is transferred."

■ Navistar asserts that regulation 1501's "true object" test should be applied here. According to Navistar, its sale to Caterpillar of the drawings and designs, as well as the manuals and procedures, involved the transfer of intangible property, because Caterpillar's "true object" in purchasing those

documents was not to obtain them for their own sake, but to acquire the intangible trade secrets and similar information *contained* in the documents.

In support of its argument, Navistar points to certain language, commonly referred to as the "manuscript example," in regulation 1501: "[A]n idea may be expressed in the form of tangible personal property and that property may be transferred for a consideration from one person to another; however, the person transferring the property may still be regarded as the consumer of the property. Thus, the transfer to a publisher of an original manuscript by the author thereof for the purpose of publication is not subject to taxation. The author is the consumer of the paper on which he has recorded the text of his creation. However, the tax would apply to the sale of mere copies of an author's works or the sale of manuscripts written by other authors where the manuscript itself is of particular value as an item of tangible personal property and the purchaser's primary interest is in the physical property. Tax would also apply to the sale of artistic expressions in the form of paintings and sculptures even though the work of art may express an original idea since the purchaser desires the tangible object itself; that is, since the *true object* of the contract is the work of art in its physical form." (Reg. 1501, italics added.)

We discussed the "true object" test and the manuscript example in *Simplicity Pattern Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 900 [167 Cal.Rptr. 366, 615 P.2d 555] (*Simplicity*). That case involved the sale of film negatives and master recordings used to make audiovisual materials for the training of medical personnel. (*Simplicity, supra,* 27 Cal.3d at p. 903.) The plaintiff argued that under regulation 1501 no tax should be imposed on the sale because the buyer's primary purpose was to acquire the intangible sounds, ideas, and images captured on the negatives and recordings rather than merely to obtain the negatives and recordings as physical objects. In rejecting this argument, we stated: "The provision in [regulation 1501's] excerpt for nontaxability of the transfer of a manuscript from author to publisher does not seem to fit the regulation's category of a 'transfer of tangible personal property incidental to the performance of service.' There is no indication that the author is to render anything of value apart from the manuscript itself. *Yet by no means does the regulation support plaintiff's broad theory that a sale becomes nontaxable whenever its principal purpose is to transfer the intangible content of the physical object being sold.* The regulation declares taxable a 'sale of mere copies of an author's works' even though books, pamphlets, etc. normally are purchased for the author's ideas rather than for their physical components." (*Simplicity, supra,* 27 Cal.3d at p. 909, italics added.)

As shown in the italicized portion of this quotation from *Simplicity, supra,* 27 Cal.3d at page 909, we there rejected the contention that the "true object" test renders the sale of a physical object exempt from taxation whenever the item is purchased or acquired primarily for its intellectual content. We also observed that regulation 1501 pertains to the transfer of tangible personal property incidental to the performance of a *service.* (*Simplicity, supra,* at p. 908; see also *MCI Airsignal, Inc.* v. *State Bd. of Equalization* (1991) 1 Cal.App.4th 1527, 1530 [2 Cal.Rptr.2d 746]; Cowdrey, *Software and Sales Taxes: The Illusory Intangible, supra,* 63 B.U.L. Rev. at pp. 211-212.) In this case, Navistar's sale of the documents was not incidental to the performance of a service.

We also reject Navistar's contention that regulation 1501's manuscript example compels the conclusion that Navistar's sale of the documents at issue may not be taxed because the primary purpose of the sale was to transfer the intangible or intellectual content embodied in the documents.

As we noted in *Simplicity, supra,* 27 Cal.3d at page 909, it does not follow from the manuscript example that a sale becomes nontaxable whenever its principal purpose is to transfer the intellectual content of a physical object. In *Simplicity* the court went on to observe: "There is no indication that the author is to render anything of value apart from the manuscript itself." (27 Cal.3d at p. 909.) But an author's sale of a manuscript to a publisher for purposes of publication does transfer something of value other than the manuscript itself.[4] The author is thereby granting the publisher some or all of the author's rights in the copyright of the literary work embodied in the manuscript. A copyright is an intangible right that includes the exclusive right to reproduce, publish, and sell the literary work that is the subject of the copyright. (17 U.S.C. § 106.) The copyright is separate and distinct from the material object embodying the work. (*Id.,* § 202.) Should the publisher, however, desire the manuscript for its own sake as a historical artifact (for instance, the original James Joyce manuscript of Finnegan's Wake), the sale of the manuscript would be, as regulation 1501 states, subject to tax.

Here, Caterpillar purchased the documents in question for their own sake. As noted above, Navistar's sale of the documents was not incidental to the performance of a service. ██ ██ Nor was there a separate and

[4] The statement in *Simplicity, supra,* 27 Cal.3d at page 909, that an author does not "render anything of value separate from the manuscript itself" is correct to the extent it refers to an author's performance of a service in addition to providing the manuscript. To the extent that the statement may be read as referring to "anything of value" other than a service, it is disapproved.

distinct transfer of an intangible property right.[5] Accordingly, Navistar fails in its attempt to equate the sale of the documents to the sale of a manuscript for purposes of publication.

Navistar also contends that under *Simplicity* the sale of tangible personal property valued in part for its intellectual or intangible content is taxable only if the property is "physically useful" in the buyer's manufacturing process. In support, Navistar cites this language from our decision in *Simplicity*: "We conclude that the completed film negatives and master recordings were tangible personal property for sales tax purposes. Though valued in part for their intellectual content, they also were *physically useful in the manufacturing process*. Their value as physical objects permitted measuring the tax on their sale by the price received for their entire worth." (*Simplicity*, *supra*, 27 Cal.3d at p. 912, italics added.)

Navistar reads too much into this language from *Simplicity*. The statement does not constitute a holding that physical usefulness in the buyer's manufacturing process is a necessary condition to the taxation of the sale of items valued in part for their intellectual content. Indeed, we pointed out in *Simplicity* that the sale of books and pamphlets, although "purchased for the author's ideas rather than for their physical components," is generally taxable. (27 Cal.3d at p. 909; see Cal. Code Regs., tit. 18, §§ 1501, 1543, 1590.) Because the sale of books is taxable, it is apparent that physical usefulness in a manufacturing process is not a prerequisite to the imposition of sales tax on items valued in part for their intellectual content.

Navistar insists that its interpretation of this court's decision in *Simplicity*, *supra*, 27 Cal.3d 900, finds support in two subsequent decisions by the Courts of Appeal, *Capitol Records, Inc.* v. *State Bd. of Equalization* (1984) 158 Cal.App.3d 582 [204 Cal.Rptr. 802] and *A&M Records, Inc.* v. *State Bd. of Equalization* (1988) 204 Cal.App.3d 358 [250 Cal.Rptr. 915]. Navistar has misread those two cases.

In *Capitol Records, Inc.* v. *State Bd. of Equalization*, *supra*, 158 Cal.App.3d 582, the Court of Appeal held that master sound tapes used in

---

[5]We also reject Navistar's argument that the sale of the documents at issue should not be taxed because the parties could have structured the transaction in a manner that would have rendered the sale not taxable. "Tax law necessarily is based upon what has been done, not what might have been done. The form of the transaction governs." (*Wallace Berrie & Co.* v. *State Bd. of Equalization* (1985) 40 Cal.3d 60, 70 [219 Cal.Rptr. 142, 707 P.2d 204]; see *Higgins* v. *Smith* (1940) 308 U.S. 473, 477 [84 L.Ed. 406, 410-411, 60 S.Ct. 355] [corporation cannot avoid corporate taxes on the ground it could have done business as a partnership].) A party to a transaction cannot accept the benefits of a transaction and reject its burdens. (See, e.g., *United States Lines, Inc.* v. *State Bd. of Equalization* (1986) 182 Cal.App.3d 529, 540 [227 Cal.Rptr. 347]; *Cal-Metal Corp.* v. *State Bd. of Equalization* (1984) 161 Cal.App.3d 759, 765-766 [207 Cal.Rptr. 783].)

the production of phonograph records were taxable because they were "useful in the manufacturing process" and were not furnished incidental to a service. (*Id.* at p. 596.) The court did *not* hold, however, that the property was taxable *only* if it was physically useful in the manufacturing process.

True, the Court of Appeal in *Capitol Records, Inc.* v. *State Bd. of Equalization, supra,* 158 Cal.App.3d 582, did make a distinction between master tapes being taxable and the leasing of movies being exempt from taxation, in part because master tapes are immediately physically useful in the manufacturing process. (*Id.* at p. 601.) But the court did so in the context of explaining that the Legislature's decision to distinguish between the sale of master tapes and the leasing of movies, by taxing the sale of master tapes but not the leasing of movies, was not arbitrary and therefore did not violate the constitutional guarantee of equal protection under the law. The court did not suggest that our decision in *Simplicity, supra,* 27 Cal.3d 900, restricted taxation to property physically useful in the manufacturing process. (*Capitol Records, Inc.* v. *State Bd. of Equalization, supra,* 158 Cal.App.3d at pp. 597, 600-601.)

Likewise, the Court of Appeal's decision in *A&M Records, Inc.* v. *State Bd. of Equalization, supra,* 204 Cal.App.3d at pages 375-376, cannot be read as holding that physical usefulness in the manufacturing process is a prerequisite to the taxation of personal property. The court there concluded that the sale of master tapes was a taxable sale of tangible property, rather than a nontaxable transfer of property incidental to securing the recording services of the artists whose work was recorded on the master tapes. The court noted that the master tapes there in issue were like the master recordings involved in *Simplicity, supra,* 27 Cal.3d 900, in that both were used in a manufacturing process. (*A&M Records, Inc.* v. *State Bd. of Equalization, supra,* 204 Cal.App.3d at p. 376.) The Court of Appeal, however, did not suggest that physical usefulness was a necessary condition to taxation.

Finally, Navistar points out that Caterpillar, the buyer of the documents at issue, in its federal tax returns characterized the documents as intangibles, and that the Internal Revenue Service did not challenge this. Therefore, Navistar argues, this court too should accept that characterization.

We have no quarrel with the general proposition that a taxpayer's treatment of an asset on the taxpayer's federal tax returns may be a relevant consideration in an appropriate case. (See *McConville* v. *State Bd. of Equalization* (1978) 85 Cal.App.3d 156, 161-162 [149 Cal.Rptr. 194].) Here, however, the record shows that the federal income tax issues addressed by

Caterpillar in its tax return and by the Internal Revenue Service in its audit are not comparable to the issue presented in this case. The federal tax issues concerned amortization, depreciation, and investment tax credits. By contrast, the issue here involves the propriety of imposing a sales tax, which is imposed on the gross receipts of the sale. (§§ 6051-6051.6.) In other words, the question before us concerns classification, that is, whether assets can be taxed, not valuation, that is, how they are taxed.

As we have shown, the documents involved here must be characterized as tangible personal property for purposes of tax law, thus rendering their sale taxable. This conclusion makes it unnecessary for us to address the Board's argument that recent amendments to sections 6011 and 6012 regarding the taxation of technology transfer agreements support its position here. We merely note that a "technology transfer agreement" is an agreement by which the holder of a patent or copyright interest assigns or licenses the right to make and sell a product or use a process. (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D).) The transfer of patents and copyrights is not in issue in this case.

In the part that follows, we shall discuss Navistar's contention pertaining to the taxability of the computer programs it sold to Caterpillar.

### III.

Section 6010.9 states that the sale or transfer of "a custom computer program" is not subject to sales tax. Subdivision (d) of the statute contains this definition: " 'Custom computer program' means a computer program prepared to the special order of the customer and includes those services represented by separately stated charges for modifications to an existing prewritten program which are prepared to the special order of the customer. The term does not include a 'canned' or prewritten computer program which is held or existing for general or repeated sale or lease, even if the prewritten or 'canned' program was initially developed on a custom basis or for in-house use. Modification to an existing prewritten program to meet the customer's needs is custom computer programming only to the extent of the modification." (§ 6010.9, subd. (d).)

Here, Navistar contends that because the computer programs at issue were developed by its Solar Division for its own business use, rather than for general or repeated sale, they are custom computer programs and therefore not taxable under section 6010.9. We disagree.

A decision on point is *Touche Ross & Co. v. State Bd. of Equalization* (1988) 203 Cal.App.3d 1057 [250 Cal.Rptr. 408] (hereafter *Touche Ross*). In

that case, a corporate liquidation agent 'sold an engineering division of Kaiser Industries Corporation to Raymond International, Inc. The sale included computer programs that had been developed for internal use by Kaiser's own staff to support its engineering services. The corporate liquidation agent asserted that the transfer of the computer programs was not taxable under section 6010.9 because the programs were custom computer programs.

After reviewing the legislative declaration that accompanied the enactment of section 6010.9, the Court of Appeal in *Touche Ross* considered the statute's wording and legislative history. The court then concluded that the sale of the computer programs did not fall within section 6010.9 and was therefore taxable. The court explained: "In the enactment of section 6010.9 the Legislature has recognized that the design, development or creation of a custom computer program to the special order of a customer is primarily a service transaction and, for that reason, not subject to sales tax. However, once the program has been created and in the possession of the original customer, the design or development service has been completed, and the program itself has become a tangible personal asset of the customer. A subsequent sale of that program by the initial customer can no longer be characterized as a 'service' transaction, but rather is a transfer of a tangible personal asset produced by the original programmer's services. As such, it is subject to sales tax. (§ 6051.)" (*Touche Ross, supra,* 203 Cal.App.3d at p. 1064.) Those observations are consistent with the Board's implementing regulation, which states that a prewritten or taxable program includes "a program developed for in-house use which is subsequently offered for sale or lease as a product." (Cal. Code Regs., tit. 18, § 1502, subd. (b).)

Recognizing that the Court of Appeal's holding in *Touche Ross, supra,* 203 Cal.App.3d 1057, is contrary to its position, Navistar urges us not to follow that decision because, according to Navistar, it is contrary to the plain language and the purpose of section 6010.9. Not so.

The first sentence of section 6010.9, subdivision (d) defines "custom computer programs" as computer programs "prepared to the special order of the customer . . . ." Navistar argues that because the computer programs at issue were prepared by its Solar Division for in-house use, they fall within the plain meaning of the statutory definition of custom computer programs.

The Board, however, has not taxed Navistar for Navistar's development of computer programs for its own use. Here, the tax that the Board imposed pertained to Navistar's subsequent sale of these very same computer programs to Caterpillar. The imposition of this tax is expressly authorized by

statute. The second sentence of section 6010.9, subdivision (d) says that the term custom computer program does not include "canned" or prewritten programs "even if the prewritten or 'canned' program was initially developed on a custom basis for in-house use." In addition, as the Court of Appeal in *Touche Ross*, *supra*, noted, "the design, development or creation of a custom computer program to the special order of a customer is primarily a *service* transaction and, for that reason, not subject to sales tax." (203 Cal.App.3d at p. 1064, italics added.) The Board's action in this case was proper, for at the time of the sale to Caterpillar the original "service" transaction, in which Navistar developed the programs for its own use, had been completed. Thus, the computer programs at the time of the sale to Caterpillar were not "custom computer programs" within the meaning of section 6010.9, subdivision (d).

Also without merit is Navistar's contention that all computer programs other than those that are "canned" or prewritten are custom computer programs within the meaning of the second sentence of section 6010.9, subdivision (d). That sentence reads: "The term [custom computer program] does not include a 'canned' or prewritten computer program which is held or existing for general or repeated sale or lease, even if the prewritten or 'canned' program was initially developed on a custom basis or for in-house use." (*Ibid.*) Seizing on this language, Navistar argues that the distinction between custom computer programs, which are not taxable, and other computer programs, which may be taxable, is whether the program is canned or prewritten and held for general or repeated sale or lease.

Section 6010.9 exempts "custom computer programs" from taxation. Contrary to Navistar's assertion, it does not define "custom computer program" as any computer program not held for general or repeated sale or lease. The statute defines custom computer programs as computer programs prepared to the special order of the customer. (§ 6010.9, subd. (d).) The statute refers to "canned" or prewritten computer programs held for general sale or lease only as an *exclusion* from the definition of custom computer programs. (*Ibid.*) Navistar would have us consider only the exclusion and ignore the basic definition. This we decline to do.[6]

Navistar also argues that to treat as nontaxable the service performed in creating a computer program for a customer, but to tax the customer's

---

[6]The concurring and dissenting opinion reasons as follows: (1) subdivision (d) of section 6010.9 divides all computer programs into the categories "custom" and "canned"; (2) the statute defines a "canned" program as a "prewritten program which is held or existing for general or repeated sale"; (3) therefore, any computer program not held for general or

subsequent sale of the same program to another, is inconsistent with the Legislature's treatment of computer media for purposes of property taxation. We disagree. Section 995 states that the storage media for computer programs, but not the computer programs themselves, are subject to *property* taxes; that is, the computer programs themselves are not subject to property taxes while possessed by the owner. Section 6010.9 also does not authorize the imposition of a *sales* tax on the owner's use of the program while in the owner's possession.

With respect to the computer programs Navistar developed for its own use and later sold to Caterpillar, the transfer was taxable because at the time of their sale the service performed in developing the computer programs for Navistar had been completed. Thus, when the sale occurred, the programs were not within the statutory definition of custom computer programs as programs developed as a special order.

*Conclusion*

For the reasons set forth above, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Arabian, J., George, J., and Werdegar, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—I concur in the majority's holding that the sale of documents (i.e., drawings, designs, manuals, and procedures) by Navistar International Transportation Corporation to Caterpillar Inc. is subject to the sales tax. I respectfully dissent, however, from the majority's further holding that the computer programs are subject to sales tax.

As the majority acknowledges, Revenue and Taxation Code section 6010.9 states that the sale or transfer of a "custom computer program" is *not*

---

repeated sale, whether prewritten or not, must be a "custom" computer program. This reading ignores both the structure and the substance of the statute.

The statute formally defines "custom computer program," not "canned" program. Under the statute, only a program "prepared to the special order of the customer" (rather than, for example, for the preparer's own use) qualifies as a "custom computer program." The statute refers to programs that are " 'canned' or prewritten" only to elaborate on what the term "custom computer program" does *not* include. The statute specifies that the term "customer computer program" *never* includes a prewritten program if the program is held for general or repeated sale, and it includes a prewritten program that has been modified for a particular customer only to the extent of the modification. Thus, a computer program cannot be a "custom computer program" if it was prewritten for the preparer's own use and sold to a customer without modification, as occurred in this case. The concurring and dissenting opinion simply misreads the statute.

subject to sales tax. Section 6010.9 categorizes computer programs into two types: custom programs and "canned" programs. For purposes of this statute, there is no other type. A program is necessarily either custom or canned. A canned program is defined as being a ". . . prewritten program which is held or existing for general or repeated sale . . . ." The majority does not purport to characterize the programs at issue in this case as being canned. Thus, they are custom programs by definition and should be exempt from sales taxation. The majority, however, creates a third category with no statutory basis: a non-canned—that is, custom—program that is taxable. I cannot concur in this judicial rewriting of the statute.