[No. B024836. Second Dist., Div. Three. Sept. 1, 1988.]

A&M RECORDS, INC., et al., Plaintiffs and Appellants, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

**COUNSEL**

Irell & Manella, Lawrence E. Goldenhersh and Robert G. Martin for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Richard E. Nielsen, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**CROSKEY, J.—** ■ ■■■■ Appellants, A&M Records, Inc. (A&M), A&M Pacific, Inc. (Pacific) and Lou Adler (Adler), who are plaintiffs in two consolidated cases (collectively plaintiffs),[1] appeal from a summary judgment granted in favor of defendant, the State Board of Equalization of the State of California (the Board), and from an order which granted the Board's motion *in limine*.[2] ■ ■ ■ ■ 'In both of the cases, the respective plaintiffs sought a refund, plus interest, of certain sales and use taxes[3] which they had paid to the Board. The trial court determined that plaintiffs are not entitled to any refunds and awarded summary judgment in favor of the Board. For the reasons discussed below, we affirm.

### PROCEDURAL BACKGROUND

On March 17, 1978, plaintiff A&M filed its complaint for refund of certain sales and use taxes which it paid for the period July 1, 1970, through March 31, 1974. The Board filed its answer, denying A&M's alleged right to a refund.[4] Stipulations of facts, together with exhibits thereto, were filed by the parties in both cases. The Board filed a motion *in limine* by which it sought to preclude plaintiffs from using at trial any evidence which they had not previously presented to the Board at the administrative hearings which preceded the contested tax payments and from using any evidence in support of any legal theories not contained in plaintiffs' claims for refund which they filed after paying the taxes. The trial court granted the Board's motion. Thereafter, the Board filed a motion for summary judgment which the court also granted. Summary judgment was entered and plaintiffs filed a timely appeal.

### FACTUAL BACKGROUND

The following recitation of facts is taken from the parties' own stipulations of facts.

---

[1] Case No. 233773 was filed by A&M and case No. 234000 was filed by Pacific and Adler, as successors in interest to the claims asserted in their lawsuit.

[2] An order granting a motion *in limine* is not an appealable order. However, such an order is reviewable on appeal from the judgment. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 41, 80, 86, pp. 64-65, 103-104, 107-108.)

[3] As discussed *infra,* a *use* tax is imposed on the storage, use or consumption in California of tangible personal property purchased or leased from a retailer outside of the state, whereas a *sales* tax is imposed on goods purchased or leased within the state.

[4] The record does not contain the complaint and answer for the action which was filed by Pacific and Adler but the record does reflect that the tax period in question in that case was April 1, 1970, through March 31, 1974. Henceforth these tax periods are referred to together as the "subject period."

## 1. *The Nature of Plaintiffs' Business and the Taxes Imposed*

Plaintiffs are engaged in the business of creating for sale, phonograph records, eight-track cartridge tapes and cassette tapes which contain performances of various recording artists. Pursuant to an audit by the Board for the subject period, plaintiffs paid certain sales and use taxes, plus interest, nearly all of which they protested.[5] The taxes which were assessed against plaintiffs fall into three categories:

a. A use tax on plaintiffs' use of "master tapes" (discussed *infra*), which the Board contends were used *in* California and produced *outside* of California. The amount of this tax was measured by payments made by plaintiffs ("royalties") during the subject period, pursuant to agreements between themselves and corporations known as "artist companies."[6] These agreements are hereafter referred to as "type B contracts." In connection with the type B contracts, the artist also entered into an agreement ("inducement letter") directly with plaintiffs.

b. A sales tax, measured by payments made *to* plaintiffs during the subject period pursuant to agreements executed between them and two record clubs, Columbia Record Club and Capitol Record Club. These are hereafter referred to as "record club contracts."

c. A use tax, measured by payments made by A&M during the subject period pursuant to agreements executed by said plaintiff and plaintiff's wholly owned subsidiaries, A&M Records Limited and A&M Records of Canada Limited. These are hereafter referred to as "subsidiary contracts."[7]

---

[5] Pursuant to the Board's audit, it assessed and A&M paid sales and use taxes in the amount of $648,592.15 plus interest, for a total of $864,874.42, of which amount $858,082.11 was protested. Subsequently, A&M paid additional interest charges of $6,485.92, all of which was protested. Pacific and Adler paid use and sales taxes in the amount of $38,106.95 plus interest, for a total of $49,703.03 of which amount they protested $49,118.45. Subsequently Pacific and Adler paid additional interest charges of $381.07, all of which they protested.

Plaintiffs were informed of the Board's assessments by means of notices of determination. Thereafter plaintiffs filed petitions for redetermination. The Board issued notices of redetermination wherein it affirmed its original assessment of the taxes due and increased the amount of interest due. Plaintiffs paid the charges and then filed claims for refund. When their claims were denied, plaintiffs filed the instant actions to recover the claimed refunds.

[6] Generally each artist company with whom plaintiffs contracted was at all relevant times owned and controlled by the recording artist and each artist entered into a recording contract with his own artist company.

[7] Taxes were not assessed against plaintiffs for payments which they made pursuant to agreements between themselves and artist companies where the creation of a "master tape" occurred *in* California. These payments were deemed by the Board to be for regular California retail sales by the artist company for which said company would be responsible for the sales taxes. Nor were taxes assessed against plaintiffs for payments made pursuant to agreements which the Board deemed to be personal service in nature. These agreements are re-

## 2. The Production of Records and Tapes

To produce records and tapes, the artist and musicians record the words and music on multiple-track tape in a recording studio, working under the direction and control of a producer, who may also be the artist. The producers are generally independent contractors rather than plaintiffs' employees. They contract with the artist or the artist company and are paid royalties based on sales of the records and tapes they produce.

The multiple-track tape on which the words and music have been recorded is processed into a "master tape" by "mixing" the tracks (sounds) to the producer's desire. It is this product (the master tape) which is delivered to plaintiffs for the next steps in producing records and tapes for sale.[8] For records, the next step is to *use* the master tape (or a duplicate master tape) to make an "acetate master." For eight-track cartridge tapes and cassette tapes, the next step is to *use* the master tape (or a duplicate master tape) to make an "EQ copy."

## 3. The Basis of the Board's Assessment of Taxes

### a. Type B Contracts

It is these "uses" of master tapes upon which the Board based its assessment of use taxes for the type B contracts. The Board contends that all of the acetate masters and all of the EQ copies which plaintiffs made from certain master tapes were made in California; i.e., the Board contends that the master tapes acquired from outside of California were *used* exclusively in California to make the acetate masters and EQ copies and therefore those uses were subject to California use taxes.

After they filed these actions, plaintiffs for the first time contended that certain of the acetate masters and EQ copies were made outside of California; i.e., plaintiffs now contend that the master tapes, from which those certain acetate masters and EQ copies came, were *used* outside of California and therefore those uses were not subject to the California use tax.[9]

cording contracts made by plaintiffs with recording artists and are referred to hereafter as "type A" contracts.

[8] The Board contends it is this physical product for which plaintiffs pay royalties pursuant to the type B contracts. The royalties are paid by plaintiffs to the artist companies to acquire ownership rights of the master tape, the reproductions made from the master tape, the performances embodied therein and the copyrights thereto. The royalties are based on the sales of records and tapes. At issue in these cases with respect to the challenged use taxes are master tapes produced *outside* of California.

[9] These alleged out-of-state uses are discussed *infra* in part 4 of this factual background.

b. *The Subsidiary Contracts*

In accordance with the subsidiary contracts between A&M and its subsidiaries, A&M was granted an exclusive license to use master tapes and duplicate master tapes owned by the subsidiaries. A&M agreed to use its best efforts to manufacture, distribute and sell records and tapes made from those master tapes and duplicate master tapes. All of the acetate masters and EQ copies which were made from these master tapes and duplicate master tapes were made in California. The subsidiary contracts obligated A&M to pay royalties to the subsidiaries based upon sales of records and tapes and these royalty payments were used to measure the amount of taxes assessed against A&M. The Board's position is that the royalties paid by A&M are similar to those paid by all plaintiffs to the artist companies under the type B contracts; i.e., that they were paid for the acquisition and use of the master tapes.

c. *The Record Club Contracts*

Pursuant to the record club contracts, plaintiffs leased duplicate master tapes or acetate masters to the record clubs who in turn used them to produce records and tapes. Royalties were paid to plaintiffs on the basis of the number of records and tapes sold by the record clubs and those royalty payments were used by the Board to measure the amount of *sales* taxes assessed against plaintiffs *as retailers.*

4. *After-discovered Evidence*[10]

Plaintiffs contend it was not until May 16, 1982, that they discovered that some of the record albums at issue in these actions were "mastered" outside of California. That is, the master tapes were *used* outside of California and therefore no use taxes should have been imposed on those uses. Plaintiffs assert they notified the Board of their discovery and, on May 27, 1982, a representative of the Board stated that she would find out what position the Board would take if plaintiffs could prove that such uses of the master tapes had *not* occurred in California.·On July 23, 1982, the Board informed plaintiffs that its position would be that plaintiffs' failure to raise the "out-of-state use" defense at the administrative hearings constitutes a failure to exhaust their administrative remedies and this failure would preclude plaintiffs from raising that defense at trial. In the meantime, on June 3, 1982, at a meeting arranged by plaintiffs, plaintiffs presented preliminary evidence on

---

[10] The information discussed here is taken not from the parties' stipulations of facts but rather from the points and authorities which plaintiffs filed in opposition to the Board's motion *in limine.*

the issue and the Board's auditor stated that certain additional evidence was needed to conclusively prove plaintiffs' position.

On August 10, 1982, the Board informed plaintiffs that it would accept their offer of proof but that if it found the proof insufficient, the Board would take the position that plaintiffs had failed to exhaust their administrative remedies.[11] Thereafter, plaintiffs gathered additional evidence and forwarded it to the Board. After reviewing the evidence, the Board notified plaintiffs that it would take the position at trial that plaintiffs had failed to exhaust their administrative remedies and therefore should be precluded from presenting evidence on out-of-state uses at trial. It was this position which prompted the Board to file its motion *in limine,* by which the Board sought to preclude just such evidence.

### CONTENTIONS ON APPEAL

On appeal plaintiffs contend the trial court erred in granting the Board's motion *in limine.* They argue they were not required to assert their "out-of-state use" defense at the administrative hearings in order to be able to assert it in this action.

Plaintiffs also contend the court erred in granting the motion for summary judgment. They assert that a triable issue of material fact exists concerning the nature and purpose of the type B contracts.

Finally, plaintiffs contend that taxing the royalties which they received from their record club contracts constitutes a double taxation which is prohibited by the Revenue and Taxation Code.

### DISCUSSION

### *The Motion in Limine*

1. *The Nature of the Use Tax*

California's Use Tax Law is found at sections 6201 to 7273.1 of the Revenue and Taxation Code.[12] ■ "The Use Tax Law . . . was designed to reach transactions involving property purchased from outside the state, not subject to California sales tax so that an unfair burden would not be placed upon local retailers engaged in intrastate commerce; it is also de-

---

[11] Thus, the Board reiterated its position regarding the necessity for exhaustion of administrative remedies but did allow plaintiffs an opportunity to settle the matter if they could.

[12] Unless otherwise indicated, all statutory references herein are to the Revenue and Taxation Code.

signed to reach transactions where property was purchased with the intent to resell but where there is a subsequent change of intent and a change of use. [Citations.] The Use Tax Law is complemental to the California Retail Sales Act of 1933 so that all taxable property is taxed once for the support of the state government. [Citation.]" (*McConville* v. *State Bd. of Equalization* (1978) 85 Cal.App.3d 156, 159 [149 Cal.Rptr. 194]; accord *Capitol Records, Inc.* v. *State Bd. of Equalization* (1984) 158 Cal.App.3d 582, 588-589 [204 Cal.Rptr. 802].)

Section 6201 defines the use tax. It states in pertinent part: "An excise tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property purchased from any retailer on or after July 1, 1935, for storage, use, or other consumption in this state . . . ." Under section 6201, the rate of the tax is 4.75 percent of the purchase price of the property. Section 6202 provides in part: "Every person storing, using, or otherwise consuming in this State tangible personal property purchased from a retailer is liable for the tax. His liability is not extinguished until the tax has been paid to this State . . . ."

## 2. *The Nature of a Taxpayer's Remedies for Contested Taxes*

Article XIII, section 32 of the California Constitution provides, "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, *in such manner as may be provided by the Legislature.*" (Italics added.)

The Legislature has provided that before a taxpayer may file an action against the state to recover a use or sales tax he has paid, he must first file a claim with the Board for a refund. (§§ 6932, 6901-6908.) The claim must be in writing and must state the specific grounds upon which it is founded. (§ 6904.) In addition, a suit against the state, following the Board's action on the claim for refund, *must be on the grounds set forth in the claim for refund.* (§ 6933.) "A refund claim must state the taxpayers' [*sic*] specific grounds. (§ 6904.) ■ His refund action is confined to the grounds set forth in his claim. The refund claim thus frames and restricts the issues to be litigated. *(Richfield Oil Corp.* v. *State Bd. of Equalization* (1946) 329 U.S. 69, 73 [91 L.Ed. 80, 87, 67 S.Ct. 156].)" (*King* v. *State Bd. of Equalization* (1972) 22 Cal.App.3d 1006, 1015 [99 Cal.Rptr. 802]; accord *American Alliance Ins. Co.* v. *State Bd. of Equalization* (1982) 134 Cal.App.3d 601, 609 [184 Cal.Rptr. 674; 30 A.L.R.4th 865].) In *King,* the taxpayer sought to recover sales taxes he had paid; in *American Alliance Ins. Co.,* the taxpayer sought to recover an insurance tax. (For similar provisions regarding other

types of taxes, see, e.g. §§ 12977-13108 [insurance taxation]; §§ 5096-5152 [property taxation]; Unemp. Ins. Code §§ 1176-1243 [unemployment compensation, claim for refund to be filed with the Franchise Tax Board].)

California courts have upheld these procedural requirements for filing actions against the state, referring to them as administrative remedies which must be exhausted before the action can be filed. (*Patane* v. *Kiddoo* (1985) 167 Cal.App.3d 1207, 1211-1214 [214 Cal.Rptr. 9] [taxes assessed as unemployment insurance contributions]; *American Alliance Ins. Co.* v. *State Bd. of Equalization, supra,* 134 Cal.App.3d at p. 609 [insurance taxes]; *Barnes* v. *State Bd. of Equalization* (1981) 118 Cal.App.3d 994, 1001 [173 Cal.Rptr. 742] [sales and use taxes].) In *Wallace Berrie & Co.* v. *State Bd. of Equalization* (1985) 40 Cal.3d 60 [219 Cal.Rptr. 142, 707 P.2d 204], the Supreme Court called the doctrine a "rule of procedure." The court referred to the failure to state in a claim for refund a ground which is later raised in a taxpayer suit (i.e., a failure to exhaust one's administrative remedies) as a "jurisdictional defect." (*Id.* at p. 66, fn. 2; accord *American Alliance Ins. Co.* v. *State Bd. of Equalization, supra,* 134 Cal.App.3d at p. 609.) ■ Thus, courts have recognized that this failure to exhaust administrative remedies, being as it is a bar to the *trial* of issues of fact, will warrant a summary judgment even though issues of fact may exist. (*Patane* v. *Kiddoo, supra,* 167 Cal.App.3d 1207; *Barnes* v. *State Bd. of Equalization, supra,* 118 Cal.App.3d at pp. 1001-1002.)

Applying these rules to the instant case, it would seem obvious that even though there may be an issue of fact as to whether certain record albums were mastered outside of California, and therefore not subject to use taxes, the trial court nonetheless had no jurisdiction to try that issue because it was not raised as a ground in plaintiffs' claims for refund. ■ Lacking that jurisdiction, the court could therefore properly grant the Board's motion *in limine* which sought only to preclude plaintiff from introducing evidence at trial which concerned that issue.

Plaintiffs, however, do not concede this point. Rather, they raise various theories as to why the rules regarding exhaustion of administrative remedies do not apply to them. In a seemingly endless number of pages in which they often mischaracterize and misconstrue cases which they cite, plaintiffs seek to convince this court that a "nullity exception" relieves them of section 6933's direction to sue only on the grounds set forth in their claim for refund. In addition, plaintiffs assert that "uncontroverted evidence" shows that the Board collected use taxes on master tapes which plaintiffs never used, stored or otherwise consumed in California. Thus, contend plaintiffs, the Board acted beyond the scope of its statutory authority and in contravention of the United States Constitution when it collected those taxes; and

having been given by plaintiffs the opportunity to correct its error, the Board should not be unjustly enriched by its invocation of the "exhaustion of remedies" doctrine. We disagree with all of these contentions and we find that the Board's motion *in limine* was properly granted.

3. *The Nullity Exception*

The nullity exception upon which plaintiffs rely was discussed by the Supreme Court in *Stenocord Corp.* v. *City etc. of San Francisco* (1970) 2 Cal.3d 984, 987 [88 Cal.Rptr. 166, 471 P.2d 966]. There the court stated "Ordinarily a taxpayer seeking relief from an erroneous assessment must exhaust available administrative remedies before resorting to the courts. [Citations.] An exception is made when the assessment is a nullity as a matter of law because, for example, the property is tax exempt, nonexistent or outside the jurisdiction [citations], and no factual questions exist regarding the valuation of the property which, upon review by the board of equalization, might be resolved in the taxpayer's favor, thereby making further litigation unnecessary [*sic*] [citations]." Thus, in *Parrott & Co.* v. *City & County of S. F.* (1955) 131 Cal.App.2d 332, 341-342 [280 P.2d 881], the court held that the plaintiff was not required, before filing its action to recover the personal property taxes it had paid, to first apply to the county board of equalization for review and adjustment of the assessment because the *amount* of the assessment was not the issue. Plaintiffs here contend that the nullity exception applies to them because certain of the uses made of their master tapes were made outside the jurisdiction. We disagree.

■ First, the requirement of article XIII, section 32 of the Constitution (set out *ante* at p. 367) that actions which are filed for the recovery of taxes be brought in the manner provided by the Legislature, applies only to actions against the state, such as the instant one. (*Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277, 281, fn. 6 [165 Cal.Rptr. 122, 611 P.2d 463].) Thus, tax cases which concern assessments by local governments require no analysis of section 32. (*Id.* at p. 281.) Nevertheless, all of the cases cited by plaintiffs where the nullity exception was applied concern taxation by local authorities and thus are not direct authority for the instant case which is governed by article XIII, section 32. In addition, even apart from this distinction, another major dissimilarity exists between those cases and the instant ones. It involves the nature of the taxes being challenged.

■ There are three characteristics common to the cases upon which plaintiffs rely in their attempt to convince us to apply the nullity exception here: the taxpayers were assessed taxes which they opposed; by statute they had access to boards of equalization which were empowered to review and

adjust the tax assessments (§ 1601 et seq.; § 1815 et seq.); and they failed to apply to these boards for relief, but instead paid the tax and then sought a refund through the courts. (See, e.g. *Stenocord Corp.* v. *City etc. of San Francisco, supra,* 2 Cal.3d 984; *Parr-Richmond Industrial Corp.* v. *Boyd* (1954) 43 Cal.2d 157 [272 P.2d 16]; *City & Co. of S. F.* v. *County of San Mateo* (1950) 36 Cal.2d 196 [222 P.2d 860]; *Focus Cable of Oakland, Inc.* v. *County of Alameda* (1985) 173 Cal.App.3d 519 [219 Cal.Rptr. 95]; *Parrott & Co.* v. *City & County of S. F., supra,* 131 Cal.App.2d 332.) In *Stenocord, Parr-Richmond, Focus Cable* and *Parrott,* the boards of equalization were local boards; in *City & Co. of S. F.,* it was the State Board of Equalization to which the plaintiffs would have applied for administrative relief because it was city-owned land being assessed. In *Parr-Richmond, Focus Cable* and *Parrott* the courts applied the nullity exception; in *Stenocord* and *City & Co. of S. F.* they did not. In none of these cases, or the others cited by plaintiffs, did the failure to exhaust administrative remedies involve the precise issue presented here, i.e., the failure to state in a claim for refund of *sales and use* taxes a ground later raised in a taxpayer suit.

"The Supreme Court has emphasized the importance of the doctrine of exhaustion of administrative remedies as applied to actions involving sales and use taxes. It pointed out that matters of both law *and fact* must be first presented to the board for adjudication before resort to the courts so that the board may be afforded the opportunity to rectify any mistake in tax collection." (*Barnes* v. *State Bd. of Equalization, supra,* 118 Cal.App.3d at p. 1001 [the Supreme Court opinion to which the *Barnes* court referred is *People* v. *West Publishing Co.* (1950) 35 Cal.2d 80 (216 P.2d 441)].) The statutory scheme for presenting an application for a reduction of an assessment, such as the courts found needed to be used in *Stenocord* and *City & County of S. F.,* is entirely different from presenting to the Board, in a claim for refund of sales and use taxes, issues of law and fact for adjudication.

Section 405 requires the county assessor to assess all taxable property in his jurisdiction and section 601 requires the assessor to prepare an assessment roll which lists all such property. This roll is delivered to the auditor (§ 617) and its information is furnished to the assessees (§ 619). A person affected by an assessment may apply for a reduction in that assessment. (§§ 1603, 1604, 1840.) The board of supervisors, meeting as a county board of equalization, or as an assessment appeals board (§ 1601) (or the State Board of Equalization, for property owned by a county, city, or municipal corporation (§ 1815 et seq.)) then make their own determination of the property's value (§§ 1610.8, 1841). Changes in the assessment which the board makes are then made on the local roll (§ 1613) and the auditor is notified (§ 1614).

Under this scheme, the board of equalization is just one of the different entities operating. ▪ "The function of a County Board of Equalization,

as its name implies, is to increase or lower an assessment in order to equalize property assessments on the local rolls, and to make the assessment conform with the true value of the property. [Citations.]" (*Parrott & Co.* v. *City & County of S. F., supra,* 131 Cal.App.2d at p. 342.) The board of equalization has special competence to evaluate property. (*Stenocord Corp.* v. *City etc. of San Francisco, supra,* 2 Cal.3d at p. 988; *Star-Kist Foods, Inc.* v. *Quinn* (1960) 54 Cal.2d 507, 511 [6 Cal.Rptr. 545, 354 P.2d 1].) The board conveys any reassessment to the assessor. ██ Thus, it is only logical for the cases relied on by plaintiffs to hold that if valuation is not an issue, the taxpayer need not apply to the local board of equalization for administrative relief. In contrast, when a taxpayer receives a notice of determination from the Board regarding sales or use taxes which the Board claims are due, and the taxpayer wishes to challenge the determination, the Board itself is statutorily equipped to decide all issues, whether they are factual or legal questions, and whether the taxpayer challenges merely the amount of the taxes or claims they are a nullity as a matter of law. Thus, the taxpayer must resort to the Board first for determination of *all* issues. (*Barnes* v. *State Bd. of Equalization, supra,* 118 Cal.App.3d at pp. 1001-1002.)[13] This includes the factual question of whether plaintiffs used master tapes inside or outside of California. Plaintiffs' failure to state this ground in their claim for refund was a failure to exhaust their administrative remedies and bars them from raising it at trial. (*Wallace Berrie & Co.* v. *State Bd. of Equalization, supra,* 40 Cal.3d at p. 66, fn. 2; *King* v. *State Bd. of Equalization, supra,* 22 Cal.App.3d at p. 1015.)

4. *The Evidence Regarding Plaintiffs' Out-of-state Use of Their Master Tapes*

Plaintiffs assert that "uncontroverted evidence" shows that the Board collected use taxes on master tapes which plaintiffs never used, stored or otherwise consumed in California. They further assert that in so collecting the taxes, the Board acted outside of its statutory authority and in contravention of the due process clause in the Fourteenth Amendment of the federal Constitution. Plaintiffs argue that the Board, having had a chance to review this "uncontroverted evidence" during the course of this action, is now precluded from invoking the exhaustion rule against that evidence because it would enable the Board to unjustly enrich itself. We reject the whole of plaintiffs' argument.

First, it would be absurd for this court to hold, as we do, that plaintiffs' failure to exhaust their administrative remedies prevented them from pre-

---

[13]To the extent the opinion in *People* v. *Sonleitner* (1960) 185 Cal.App.2d 350, 361-365 [8 Cal.Rptr. 528], can be read to imply that the nullity exception could excuse a failure to present questions of fact and law to the Board, we disagree with that implication.

senting this evidence at trial and then hold, as plaintiffs urge us to do, that because plaintiffs nonetheless placed the evidence into the record by attaching it to certain pleadings which they filed below, we should now consider it on appeal. Even assuming arguendo that the evidence is truly uncontroverted, our conclusion that the exhaustion rule applies to this case ends the matter and prevents us from considering the evidence on appeal.

Second, as plaintiffs' own points and authorities concede, the Board agreed to examine the evidence but also told plaintiffs that it would take the position at trial that the evidence was not admissible (due to plaintiffs' failure to exhaust their administrative remedies) if it found the evidence to be insufficient. The Board was under no obligation to even consider the evidence since plaintiffs had failed to present it in their claim for refund. Plaintiffs cite no authority for the proposition that having viewed the evidence, the Board thereby gave up its right to raise the exhaustion rule.

Third, we note that the plaintiff in *Barnes* v. *State Bd. of Equalization, supra,* 118 Cal.App.3d 994, contended on appeal that "the declarations filed by defendant [in support of defendant's motion for summary judgment] do not deny that [plaintiff] had overpaid taxes to the board." The plaintiff in *Barnes* also contended that the Board's taxation involved federal questions. (*Id.* at pp. 996-997.) Nevertheless, the *Barnes* court concluded that because plaintiff had failed to exhaust his administrative remedies, the trial court had no jurisdiction to consider the factual and legal issues raised by plaintiff. (*Id.* at p. 1002.)

## 5. The Motion in Limine Was Properly Granted

In summary, we conclude that the nullity exception to the doctrine of exhaustion of administrative of remedies is not applicable to this case to relieve plaintiffs from their duty to file their taxpayer's actions *in the manner provided by the Legislature.* We further conclude that neither the alleged federal question presented by plaintiffs, nor the fact that the Board had the opportunity to view plaintiffs' evidence relating to their alleged out-of-state use of certain mastering tapes, preclude the Board's assertion at trial or on appeal that the trial court lacked jurisdiction to consider that evidence because it relates to an issue which was not set forth in plaintiffs' claims for refund. The trial court's order granting the motion *in limine* was correct.

### The Summary Judgment Motion

## 1. Standards of Review

"In reviewing a summary judgment, we are limited to the facts shown in the affidavits and those admitted and uncontested in the pleadings.

We determine only whether the facts so shown give rise to a triable issue of fact." (*Levin* v. *State of California* (1983) 146 Cal.App.3d 410, 414 [194 Cal.Rptr. 223]; Code Civ. Proc., § 437c, subd. (c).) In reviewing the Board's assessment of taxes against plaintiffs, we must determine whether the Board "properly interpreted the relevant sections of the Sales and Use Tax Law and the Board's own relevant regulations adopted pursuant to such law." (*Culligan Water Conditioning* v. *State Board of Equalization* (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593].)

Our review of the pleadings which were filed in support of and in opposition to the Board's motion for summary judgment, particularly the Board's separate statement of undisputed material facts and the plaintiffs' response thereto, reveals that only two questions were raised by those pleadings. The first question is whether all of the master tapes were used *in* California. This question was disposed of by the Board's motion *in limine* (discussed *ante*) and thus was not truly in issue at the time the motion for summary judgment was decided.

The second question is whether the type B contracts are personal service in nature or are contracts for the sale or lease of goods; i.e., whether the true object of type B contracts was to obtain the personal recording services of the artist or to obtain master tapes. Plaintiffs' duty to pay certain use taxes depends on the answer to that question. As noted earlier, sections 6202 and 6201 require people to pay use taxes on *tangible personal property* which they store, use or otherwise consume in California and which they have *purchased* from an out-of-state retailer. The use tax is measured by the consumer's purchase price (§ 6201) and the purchase price means the total amount for which the property is purchased (or leased or rented), which includes any services that are part of the purchase (§ 6011).

In opposing the motion for summary judgment, plaintiffs contended, as they do on appeal, that under the "true object" test found in Title 18, California Code of Regulations, section 1501 (regulation 1501),[14] the true object of the type B contracts was to obtain a performing artist's services, rather than to obtain tangible personal property, i.e., the master tapes. The Board contends that the true object was for plaintiffs to secure the master tapes. In support of their position, plaintiffs presented extrinsic evidence regarding the contracts; that evidence is a declaration from one Jerome

---

[14] Regulation 1501 states in pertinent part: "The basic distinction in determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract; that is, is the real object sought by the buyer the service per se or the property produced by the service. If the true object of the contract is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred."

Moss, who was president of A&M during the subject period. Mr. Moss stated in his declaration that with respect to both type A contracts (*ante*, fn. 7) and type B contracts, his purpose in entering into them was to procure the personal recording services of the recording artist. He further stated "As A&M's object in entering into the contracts was to secure the personal services of the artists, however those services were embodied, the transfer of the master tapes embodying the services of the artists for which A&M had contracted was merely incidental to the artists' performance of their obligations under the contracts that had been negotiated."

In its memorandum of decision, the trial court set out the test regarding parol evidence in construing a contract, quoting from *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d. 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.]" The trial court then went on to say "Given the rule, the facts of this case and the holdings in *Simplicity* [*Simplicity Pattern Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 900 (167 Cal.Rptr. 366, 615 P.2d 555).] and *Capitol Records*, [*Capitol Records Inc. v. State Bd. of Equalization, supra,* 158 Cal.App.3d 582], this court finds little difficulty in holding, as a matter of law, that the contract language here in question is not reasonably susceptible of the interpretation A&M seeks to place upon it and, thus, the subjective views of declarant Moss and, perhaps, others are irrelevant and inadmissible. . . . [¶] *Simplicity* and *Capitol Records* are dispositive of the issues and subissues encompassed within the true object test."

■■■■ On appeal, plaintiffs contend that the Moss declaration raised a triable issue of material fact because the true object of the type B contracts presents a factual question; plaintiffs also contend that the contracts were reasonably susceptible of the interpretation given them by Mr. Moss. Thus, conclude plaintiffs, the trial court erred in granting the motion for summary judgment.

### 2. The True Object Test

As noted above, the trial court relied on *Capitol Records, Inc. v. State Bd. of Equalization, supra,* 158 Cal.App.3d 582 and *Simplicity Pattern Co. v. State Bd. of Equalization, supra,* 27 Cal.3d 900 in determining that the type B contracts are not reasonably susceptible of the "personal services" characterization which plaintiffs seek to give them. In seeking the affirmance of the summary judgment, the Board adds another case to this list—*Culligan*

Water Conditioning v. State Bd. of Equalization, supra, 17 Cal.3d 86. Based on the facts and issues of those three cases, we believe it is *Simplicity* and *Culligan* which apply to the instant case.

In *Capitol Records*, the issue was whether the contracts were sales contracts or employment contracts. The record company argued they were employment contracts and therefore no use tax could be imposed under section 6201 because the master tapes had not been "purchased from any retailer." Thus the court in *Capitol Records* focused on "employee vs. independent contractor" evidence. In contrast, in *Culligan* and *Simplicity*, the Supreme Court's focus was on the true object test, i.e., on regulation 1501.

 Plaintiffs argue that a motion for summary judgment is an inappropriate method of determining the true object of a contract and that no prior decision has resolved true object issues in a summary judgment. In *Culligan* and *Simplicity*, the true object issues were decided at trials based solely on stipulated facts (and in *Simplicity*, exhibits to the stipulation of facts). Other than the Moss declaration, that is all the trial court had before it in the instant case when it ruled on the Board's motion for summary judgment. We do not believe that the Moss declaration precluded a ruling on that motion because the motion simply asked the trial court to interpret regulation 1501 in conjunction with type B contracts.

The interpretation of a regulation, like the interpretation of a statute, is a question of *law*. (*Culligan Water Conditioning v. State Bd. of Equalization, supra*, 17 Cal.3d at p. 93.) Thus, when Mr. Moss asserted in his declaration that his object in entering into the type B contracts was to secure the recording services of the artists, and that therefore the transfer of the master tapes embodying those services was merely incidental to the artists' performances of those services, he was, *in effect*, interpreting regulation 1501 by drawing his own conclusion as to the true object of the contracts. He was therefore not stating a "fact" as that word is used in the phrase "triable issue of material fact." (Code Civ. Proc., § 437c, subd. (c).) Thus, his assertion that his object in entering into the contracts was to secure artists' services did not raise a triable issue of material fact which would preclude the trial court from ruling on the motion for summary judgment. Determination of the true object of a contract under regulation 1501, like the interpretation of any other regulation, is made by the court, not by the taxpayer. (*Culligan, supra*, at p. 93.)

 Our review of the stipulated facts, the type B contracts, regulation 1501 and the *Culligan* and *Simplicity* decisions convinces us the trial court was correct in holding as a matter of law that the true object of those contracts was the production of the master tapes and their transfer to

plaintiffs. It is quite clear that acquisition of the tangible personal property, the master tapes, was absolutely essential to plaintiffs, not merely "incidental to the performance of a service." (Cal. Code Regs., tit. 18, § 1501.) Plaintiffs had to have the master tapes produced by the contracts or the contracts were worthless. It was the master tapes which were essential in the ultimate production of the records and tapes through which plaintiffs made their revenues. In this respect, this case is similar to *Simplicity* where the tangible personal property at issue was film negatives and master recordings used to make audiovisual materials. (*Simplicity Pattern Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d at p. 903.)

In *Simplicity,* the taxpayer argued "that regulation 1501 exempts not only transfers incidental to services but also transfers of tangible objects for a primary purpose of supplying their intangible content rather than the objects themselves." (*Simplicity Pattern Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d at p. 908.) Distilled down, plaintiffs' argument that they were contracting for the artists' recording services is akin to Simplicity's argument that it was the *content* of the negatives and master recordings which was being transferred. The *Simplicity* court rejected the argument, saying that, unlike a manuscript which is transferred by its author to a publisher for publication,[15] the negatives and master recordings were not used solely for their intellectual content. Rather, they were used in the production of audiovisual materials. So also here, the master tapes are used in the production of records and tapes and are thus not used solely for their intellectual or artistic content.

Likewise, the *language* of the type B contracts leaves no doubt that attainment and ownership of the master tapes was not an incidental term of those contracts but rather its main purpose. That the artist's recording performance was an essential element in carrying out the terms of the contracts does not detract from our conclusion that as between the parties to the type B contracts, the true object of those contracts was the creation and transfer to plaintiffs of the master tapes. Thus, we hold that those master tapes are tangible personal property which, for purposes of the use tax imposed by section 6201, were sold to plaintiffs by the artist's companies.

### The Double Taxation Issue

In accordance with their contracts with plaintiffs, the record clubs produce records and tapes with the duplicate masters or acetate masters which

---

[15]The manuscript is an example which *Simplicity* had taken from the text of regulation 1501. The regulation states that the transfer of the manuscript is not subject to taxation because the physical property, the manuscript, is not the true object of the transfer, the author being the consumer not the retailer "of the paper on which he has recorded the text of his creation."

plaintiffs lease to them. The lease payments are made to plaintiffs in the form of royalties. These payments are in turn part of the revenues upon which plaintiffs pay royalties to the artist companies under the type B contracts.

The Board determined that plaintiffs owed the state sales taxes on the royalties they received from the record companies during the subject period. Section 6203 requires a retailer engaged in business in California to collect a sales tax from the purchaser of tangible personal property which will be used, stored or otherwise consumed in California. The tax must be collected at the time of the sale; if the transaction is a lease, the tax must be collected when the lessee makes payments under the lease. Section 6204 provides that the sales tax which the retailer is required to collect constitutes a debt owed *by the retailer* to the state. However, section 6006, subdivision (g)(5) (hereinafter subdivision (g)(5)) provides that the word "sale," as used in section 6203, does not include a lease of "Tangible personal property *leased in substantially the same form as acquired by the lessor* . . . as to which the lessor . . . has paid sales tax reimbursement or has paid use tax measured by the purchase price of the property. . . ." (Italics added.)

■ Plaintiffs contend the Board's collection of a sales tax on the lease payments made to them by the record clubs constitutes a violation of subdivision (g)(5). They contend that what they are providing to the record clubs (the duplicate masters and acetate masters) is in "substantially the same form" as what they acquired from the artist companies (the master tapes) and that what they acquired from the artist companies has already been subjected to the use taxes discussed above.

The Board disagrees that the duplicate master tapes and the acetate masters are in substantially the same form as the master tapes. The Board argues that simply because the leased property is identical to the master tapes it is still not the master tapes themselves. The Board asserts that "in substantially the same form" does not include identical but different property. Rather, to come within the provisions of subdivision (g)(5), the leased property must be the particular property, the actual property, as that which was acquired by the taxpayer. Here, that would be the master tapes themselves. The trial court agreed with the Board. We do also.

Although neither side cites us to any authority to support their position, *Ladd* v. *State Bd. of Equalization* (1973) 31 Cal.App.3d 35 [106 Cal.Rptr. 885] is helpful in resolving the issue. In *Ladd,* the court said the purpose of subdivision (g)(5) is to insure that when tangible personal property is changed in form, the value added to the property by the cost of the labor affecting the change is itself also taxed. (*Id*. at pp. 39-40.)

In *Ladd,* the taxpayer constructed powered houseboats from raw materials purchased by him and then rented them. The value of the boat assembled is obviously greater than the total value of the materials used in the boat. Thus, the change in the form of the materials results in an increase in their value, an increase which the state seeks to tax. In contrast, a person engaged in the business of renting, for example, power tools can receive the benefit of subdivision (g)(5) because he is simply renting without modification the same product he purchased and thus there is no increase in the value of that product. In both cases however, the lessors are leasing the exact same tangible personal property which they purchased. Not so in the instant case. Here, plaintiffs are not leasing what they purchased under the type B contracts. They are leasing *other* pieces of tangible personal property. Thus, subdivision (g)(5) does not apply to them. Plaintiffs have not pointed to any reason why our conclusion should be different simply because the tangible personal property which they are leasing looks like and sounds like the tangible personal property which they purchased.

## DISPOSITION

The judgment is affirmed. Costs on appeal to the Board.

Danielson, Acting P. J., and Luros, J.,* concurred.

A petition for a rehearing was denied September 28, 1988, and the opinion was modified to read as printed above.

---

* Assigned by the Chairperson of the Judicial Council.